# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-2601

BRENDA DANDY,

*Plaintiff-Appellant*,

v.

UNITED PARCEL SERVICE, INC.,

*Defendant-Appellee*.

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 01-C-0937—**Rudolph T. Randa**, *Chief Judge.*

_____

ARGUED APRIL 7, 2004—DECIDED OCTOBER 29, 2004

_____

Before FLAUM, *Chief Judge*, and WOOD and WILLIAMS,
*Circuit Judges.*

WILLIAMS, *Circuit Judge.* Brenda Dandy, a United Parcel
Service (UPS) employee, alleged that her employer discrimi-
nated against her on the basis of gender and race by: (1)
creating a hostile work environment; (2) failing to promote
her; (3) paying her a lower salary than her white counter-
parts; and (4) retaliating against her. The district court
granted UPS summary judgment, dismissing all of Dandy's
claims. It found that Dandy failed to establish a *prima facie*
case of hostile work environment and assumed *arguendo*
that Dandy established a *prima facie* case for her remaining
allegations, but reasoned that dismissal was proper because

she failed to prove that UPS's business decisions were a pretext for discrimination. Because we find that Dandy failed to establish a *prima facie* case for any of her claims, we affirm.

## I. BACKGROUND

Dandy has worked in the Wisconsin District of UPS for over 25 years. She first held various part-time positions at the company and was eventually promoted to full-time supervisor in 1986, the position she held at the commencement of this action. Nationally, UPS is divided into 59 geographical districts, each headed by one District Manager. In UPS's Wisconsin District, the District Manager oversees all employees in that state. Below the District Manager is the Division Manager, of which there are 14, followed by the Center Manager or Unit 2 Manager, of which there are 77. The lowest level of management is the full-time supervisor, of which there are 205. UPS operations are divided between "hubs," which receive and sort packages, and "packaging centers," which are responsible for deliveries.

In 1993, after an internal investigation, UPS acknowledged a problem with the promotion and advancement of African Americans and women at the company. In an attempt to combat this problem, UPS implemented a new promotion process which involved rating or ranking employees based on their readiness for promotion. Employees rated/ranked "A" were deemed immediately ready for promotion, while employees rated "B" were deemed ready for promotion in one year. To open advancement opportunities, UPS allows, but does not mandate, consideration of "B" ranked employees for immediate promotion.[1]

---

[1] Also, from 1999 forward, UPS created the category "D" for racial minorities and women who had potential for future advancement
(continued...)

UPS also holds annual Career Development meetings (People's Meetings) to discuss vacancies and promotions. People's Meetings are attended by District and Division Managers. At these meetings, an employee is evaluated based on his or her rating/ranking, Quality Performance Reviews (QPRs),[2] and experience in operations.[3]  According to UPS, it predominantly promotes "A" rated employees and only promoted "B" rated employees on two occasions. In January 1999, a male full-time supervisor rated "B" was promoted to Unit 2 Manager, however, Dandy did not apply for that position. Also, in early 2000, "B's" were considered for pro-

---

[1]  (...continued)
to ensure that all employees were being considered.

[2]  QPRs are completed by superiors and coworkers. Prior to 1997 QPR scores ranged from 1-6, 6 being the highest. After 1997, UPS used a 1-100 scale. Dandy's QPR scores are as follows:

| 1993 | 4.1 |
|------|------|
| 1994 | 4.4 |
| 1995 | 4.0 |
| 1996 | 5.2 |
| 1997 | 78.4 |
| 1998 | 81.2 |
| 1999 | 96.6 |
| 2000 | 75.5 |
| 2001 | 74.0 |
| 2002 | 92.5 |

[3]  Operational experience encompasses supervising employees who are moving packages or actually driving a delivery car. Dandy contends that she has operational experience, but UPS argues that she only provided support in operations and did not serve in a supervisory role. UPS also presented evidence that Dandy was offered work which would qualify as operational experience but declined the position.

motion, however, Dandy was not rated "B" at that time. She concedes that she has not received an "A" rating since 1989.

UPS compensates its employees according to "grades," operational experience, and education. Dandy is a grade 14. Salaries normally increase annually and factor in geographical cost of living differences. However, UPS does not increase an employee's base salary retroactively; therefore, a newly hired full-time supervisor's salary may be higher than a more senior full-time supervisor because the more recent hire may have a higher starting salary. There is also a subjective component to an employee's compensation. Each District Manager is given a "pool" of funds to distribute to the employees whose performance has increased the overall productivity of the district.

## II. ANALYSIS

We review the district court's decision to grant UPS summary judgment de novo and draw all reasonable inferences in Dandy's favor. *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999). In order to avoid summary judgment, she must come forward with specific and material facts which create a genuine issue for trial. *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 752 (7th Cir. 2002). Dandy has stated several allegations of discrimination under both 42 U.S.C. § 1981 and Title VII, 42 U.S.C. §§ 2000e *et seq.* First, we must consider the relevant statute of limitations which will dictate the scope of the evidence we may consider in support of each claim.

### A   Statute of Limitations and Scope of Evidence.

#### 1.   Section 1981

In *Jones v. R.R. Donnelley & Sons Co.*, 124 S. Ct. 1836, 1845-46 (2004), *rev'g*, 305 F.3d 717 (7th Cir. 2002), the Supreme Court was presented with the question of whether

§ 1981 hostile work environment, wrongful termination, and failure-to-transfer claims were governed by Congress's 4-year catch-all statute of limitations, codified in 28 U.S.C. § 1658, or by the most analogous state personal injury statute of limitations. The Court reasoned that § 1658 applies to any claim "arising under" an act of Congress which was enacted after December 1, 1990. It therefore concluded that hostile work environment, wrongful termination, and failure-to-transfer claims under § 1981 were governed by § 1658 because they were in essence "enacted" by the 1991 Civil Rights Act, which "overturned *Patterson* [*v. McLean Credit Union*, 491 U.S. 164, 171 (1989)] by defining the key 'make and enforce contracts' language in § 1981 to include the 'termination of contracts and the enjoyment of benefits, privileges, terms, and conditions of the contractual relationship.'" *Jones*, 124 S. Ct. at 1846 (quoting 42 U.S.C. § 1981(b)).[4]

Dandy alleges the following violations under § 1981: (1) hostile work environment; (2) failure to promote; (3) disparate treatment in terms of compensation; and (4) retaliation. All of Dandy's § 1981 claims are subject to § 1658's 4-year

---

[4] Under *Jones*, it would seem that pre-*Patterson* § 1981 claims which involve the making or enforcement of contracts as opposed to claims centered on "harassing conduct that occurred after the formation of the contract" would be subject to the analogous state personal rights statute of limitations as they did not "arise under" the 1991 Civil Rights Act. *Id.* at 1840; *see also Reed v. United Transp. Union*, 488 U.S. 319, 323-24 (1989) ("Congress intended that the courts apply the most closely analogous statute of limitations under state law" to claims brought under § 1983 which has no express statute of limitations); *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 661-62 (1987) (applying general state statute of limitations to action brought under § 1981); *Gray v. Lacke*, 885 F.2d 399, 407-08 (7th Cir. 1989) (applying Wisconsin's six-year general personal rights statute of limitations to 42 U.S.C. § 1983 as the most analogous).

statute of limitations because they are premised on conduct which took place after the formation of her employment contract. *Id.*; *see also White v. BFI Waste Servs.*, 375 F.3d 288, 291-92 (4th Cir. 2004) (finding disparate treatment in compensation claims stated under § 1981 are covered by § 1658). Dandy filed her complaint on September 14, 2001; therefore, we may consider events which occurred as early as September 14, 1997, on her hostile work environment and retaliation claims.

The statute of limitations on Dandy's remaining § 1981 claims alleging a failure to promote and disparate compensation on the basis of race were tolled during the pendency of a proposed class action filed by fellow UPS employees on November 26, 1997.[5] *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 352-53 (1983); *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000). On April 5, 2000, the proposed class voluntarily dismissed its failure to promote claim and on May 10, 2001, the district court denied the proposed class its motion for certification on the remaining disparate compensation claim. Therefore, giving Dandy the benefit of the tolling period, we may review evidence from May 8, 1995 to September 14, 2001, in support of Dandy's failure to promote claim and evidence from April 3, 1994 to September 14, 2001, in support of her disparate compensation claim.

### 2. Title VII

Under Title VII, a plaintiff is required to exhaust her administrative remedies by filing a complaint with the appropriate federal or state agency. *Volovsek v. Wis. Dep't of Agric., Trade & Consumer Prot.*, 344 F.3d 680, 687 (7th Cir. 2003). A plaintiff has 300 days from the alleged discrimina-

---

[5] *Abram et al. v. United Parcel Service, Inc.*, No. 97-CV-1233 (E.D. Wis. Nov. 26, 1997).

tory action to file a complaint with the appropriate state agency. 42 U.S.C. § 2000e-5(e)(1). We review solely those charges "included in [the] EEOC charge, . . . or reasonably related to the allegations of the charge and growing out of such allegations." *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 689 (7th Cir. 2001). Generally, we may solely consider evidence from the 300-day period. *Hardin*, 167 F.3d at 344. However, as the statute of limitations is not jurisdictional in nature, it is subject to equitable considerations. *Volovsek*, 344 F.3d at 687.

For example, if a plaintiff alleges "continuing violations," which constitute a pattern and practice of discrimination, we may look outside of the relevant time period. *Hardin*, 167 F.3d at 344. This doctrine applies to Title VII as well as § 1981 claims. The Supreme Court has explained the continuing violation doctrine as "preclud[ing] recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period," but permitting "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, . . . for the purpose of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002).

Dandy filed her first relevant EEOC charge on February 18, 1997 and the second on October 2, 1997. She received her right-to-sue letter for both charges on April 30, 1999. She filed her third EEOC charge on September 5, 2000. As Dandy filed suit in federal court more than 90 days after she received her right-to-sue letter from her first and second EEOC charges, *see* 42 U.S.C. § 2000e-5(f), the allegations stated therein are not properly before us and she is limited to the claims explicitly stated in her third EEOC charge or claims "reasonably related" to those charges. *Haugerud*, 259 F.3d at 689. In her third EEOC charge, Dandy alleged that she was denied promotions on account

of her race and gender and that she was retaliated against for filing her previous EEOC charges. She makes no mention of unequal pay or a hostile work environment and therefore those claims are not properly before us. *See Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994) (finding claim not expressly stated in EEOC charge is "reasonably related" to articulated claim and properly before this court if it involves the same conduct and same individuals). As it relates to the Title VII claims properly before us, we will review evidence concerning her claims for failure to promote on the basis of gender and for retaliation from November 11, 1999 to September 5, 2000. Dandy's Title VII claim alleging a failure to promote on the basis of race parallels her § 1981 claim and thus will be analyzed under § 1981.

### B. Dandy has failed to state a *prima facie* case of hostile work environment based on race under § 1981.

Dandy bases her hostile work environment claim on several comments made by UPS managers dating as far back as 1992 and 1993. In 1992, she alleges that Division Manager Gary Wehner stated that the lack of promotion opportunities available at UPS were due to the "niggers and cunts." Dandy did not hear this statement firsthand but was told about the incident by other employees. In 1993, three Center Managers called Dandy a "bitch." Once again, Dandy was told about the comments by a co-worker. She received an apology from each manager. Also, in 1993, District Manager Ralph Sergott called someone a "fucking nigger" at an after-work card game. Dandy also heard about this comment from another employee who attended the card game. Sometime later, a Security Supervisor called Dandy a "tiger." Dandy concedes that the District Manager addressed this name-calling. And finally, in 1998, Ray Schyvinck, a full-time supervisor, stated, in Dandy's presence, that an African

American Division Manager was "lazy" and that another white female manager was "ignorant."

To be actionable under § 1981, harassment must be: (1) based on race; (2) subjectively and objectively hostile; and (3) sufficiently severe *or* pervasive to interfere with an employee's ability to perform his assigned duties. *Hrobowski v. Worthington Steel Co. & Worthington Indus., Inc.*, 358 F.3d 473, 476 (7th Cir. 2004). Under the objective hostility analysis, courts may consider: (1) the frequency of the conduct; (2) the severity of the conduct; (3) "whether it is physically threatening or humiliating, or a mere offensive utterance"; and (4) whether it unreasonably interferes with the employee's ability to complete his or her assigned duties. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Having failed to show that the use of racially charged comments continued during the relevant statutory period, Dandy is barred from relying on conduct prior to September 14, 1997, to sustain her hostile work environment claim under the "continuing violation" doctrine. *Morgan*, 536 U.S. at 105; *Hardin*, 167 F.3d at 344. Focusing on the pertinent time period, Dandy has alleged solely that she was called a "tiger"(which presumably is an attack on her gender not her race) and that another African American employee was called "lazy" and a white female coworker was called "ignorant." She has failed to allege that these statements were attributable to race or gender. Furthermore,"offhand comments, and isolated incidents (unless extremely serious)" are not sufficient to sustain a hostile work environment claim. *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)). We must conclude that a reasonable person could not find a work environment hostile based on these two statements. *See Harris*, 510 U.S. at 21.

Even if Dandy were permitted to rely on the comments made in 1992 and 1993, they would be insufficient to prove

that she was subjected to a hostile work environment on the basis of race. The use of racial epithets is deplorable and this court has recognized that the use of "the word 'nigger' can have a highly disturbing impact on the listener." *Hrobowski*, 358 F.3d at 477. We also acknowledge that "a supervisor's use of the term impacts the work environment far more severely than use by co-equals." *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993). However, we also recognized that in determining whether remarks "objectively" create a hostile work environment we must assess the frequency of their use, *Hrobowski*, 358 F.3d at 477 n.2, as well as whether the remarks were stated directly to the plaintiff or whether the plaintiff heard them secondhand, *McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 567 (7th Cir. 2000). That is not to say that racial epithets *must* be stated directly to a plaintiff to create an objectively hostile work environment. Repeated use of such highly offensive terms in the work environment (especially considering the fact that racial epithets are meant to denigrate a group of people) may create an objectively hostile work environment, even if they are heard secondhand. Here, however, it is undisputed that the remarks were made in 1992 and 1993, over ten years ago, were stated once, and were not heard directly by the plaintiff. This analysis would be markedly different if Dandy were able to show that these highly offensive comments were made more than once, or able to show that the sentiments which underlie the comments pervaded the work environment. Nor has Dandy shown that these comments interfered with her ability to perform her duties at UPS. *McPhaul*, 226 F.3d at 567. Under these circumstances, even though we are deeply troubled by the allegation that the comments came from senior management, precedent does not permit a finding that Dandy's work environment was made objectively hostile.

**C. Dandy has failed to establish a *prima facie* case for race or gender discrimination under Title VII or § 1981 based on UPS's decision not to promote her.**

A plaintiff may prove intentional discrimination, under Title VII or § 1981, through direct or circumstantial evidence (direct method) or resort to the indirect burden-shifting method described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the direct method, a claimant must show either "an acknowledgement of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). An example of direct evidence would be an employer's admission that an adverse employment action was taken against an employee based solely on an impermissible ground, such as race. This type of evidence is admittedly rare. Circumstantial evidence, on the other hand, may come in the form of "suspicious timing, ambiguous statements oral or written, [or] behavior toward or comments directed at other employees in the protected group . . . ." *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

Racial epithets or stray remarks may be direct or circumstantial evidence of intentional discrimination if they are sufficiently connected to the employment decision, i.e., made by the decisionmaker, or those who influence the decisionmaker, and made close in time to the adverse employment decision. *Id.*; *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 576 (7th Cir. 2003); *Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 444 (7th Cir. 1997). Dandy acknowledges that she has not received an "A" rating (ready to promote) since

1989. UPS claims that it only promotes those ranked "A."[6] Thus, to establish direct evidence of intentional discrimination, Dandy must show that the people who ranked her, and therefore thwarted her opportunity for promotion, intentionally ranked her below "A" because of her race or gender.

From 1994 to 1997, Charlie Brooks, Dandy's Division Manager, found that she was not ready for promotion because she lacked leadership skills and did not have sufficient supervisory experience in operations. Her subsequent Division Manager, Ken Raymond, an African American, also found that Dandy was not ready for promotion for many of the same reasons stated by her previous manger. Dandy's Division Manager from 1998 to 2000, David Ruiz, also echoed the sentiments of her previous managers. Finally, Kelli Franklin-Joyner, an African American woman, who was Dandy's Division Manager from 2000 to 2002, also chose not to classify her as ready for promotion. Dandy has presented no evidence that any of her managers were motivated by racial animus or made any stray remarks which reveal that they may have evaluated her based on illegal criteria. The comments which were made during the relevant period, i.e., the "tiger" comment and the "ignorant" and "lazy" comments, do not aid Dandy because they were made by co-equals with no

---

[6]  Dandy makes much of the fact that under UPS policy employees rated "B" *may* be promoted. She then leaps to the conclusion that UPS's decision not to promote her based on her QPRs and "B" rank was a pretext for discrimination. However, she has presented no evidence that, according to UPS policy, "B" rated employees *must* be promoted or that UPS consistently promoted other employees rated "B." According to the record, during the relevant time period, only two employees rated "B" were promoted from full-time supervisor to Center Manager or Unit 2 Manager. The first job opening occurred in January 1999, however, Dandy did not apply for the position. The second job opening for a "B" ranked employee came in early 2000, however, at that time Dandy's rating was below "B."

influence over the ultimate decisionmaker. *See Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999) ("Direct evidence typically relates to the motivation of the decisionmaker responsible for the contested decision.") (internal quotations omitted). Furthermore, even if this court were to consider the racial epithets made in 1992 and 1993 as support for Dandy's claim, she has presented no evidence of a link between those comments and any of her evaluators (two of whom are African American). *See id.*

Having failed to establish direct or circumstantial evidence of intentional discrimination, Dandy must proceed under the indirect method of proof under the familiar *McDonnell Douglas* burden-shifting approach. Establishing a *prima facie* case of discrimination based upon a failure to promote requires that Dandy prove that: (1) she is a member of a protected class; (2) she had the requisite qualifications for promotion; (3) she was denied the promotion; and (4) a member of the nonprotected class who was not better qualified was promoted instead. *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003).

The district court assumed *arguendo* that Dandy satisfied her *prima facie* case (for all of her remaining claims) and granted UPS summary judgment based upon Dandy's inability to prove pretext. This court has repeatedly stated that we disfavor such an approach. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 327 (7th Cir. 2002). "[T]he *prima facie* case is the condition precedent to the pretext analysis" and should not be bypassed. *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997). Assessing the record, we find that Dandy has not satisfied her *prima facie* case, for any of her remaining claims, and affirm the district court's decision on that basis. *See Peele*, 288 F.3d at 327 (reasoning that even though the district court skipped the *prima facie* analysis, we may affirm on this basis based on this court's review of the record).

Dandy has failed to show that she was qualified for promotion. Over an eight-year period, Dandy's managers consistently stated that she was not ready for promotion. Dandy admits that she was only ranked "B" from 1994 to 1996 and again in 1998 and at all other times she was ranked lower. (Recall, she has not been ranked "A" since 1989.) Her rankings correspond to her QPRs, which also show that Dandy was not highly regarded by her coworkers or her superiors. *See supra*, note 2. The consistency of her evaluators' substantive assessments coupled with the conclusions of her coworkers in her QPR scores undermines Dandy's argument that the evaluations were a sham and that she was actually ready for promotion.

Dandy has given this court no concrete way to measure the candidates she alleges were unlawfully promoted over her and instead has taken a "kitchen sink" approach to her appeal by listing every white male employee promoted to a rank higher than full-time supervisor without identifying any coherent method of analysis. *See Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 753 (7th Cir. 2002) (rejecting denial of career opportunities claim because plaintiff failed to give specifics); *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1177 (7th Cir. 2002) (discussing the possible use of statistical analysis of data when attempting to prove failure to promote claim); *Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir. 1996) (same). Therefore, Dandy's failure to promote claim must fail.

**D. Dandy has not proven that she was paid a lower salary on the basis of her race or gender as she has failed to identify "similarly situated" non-protected class members who were treated more favorably.**

To state a *prima facie* case of disparate compensation, a plaintiff must show that: (1) she is a member of a protected

group; (2) she was fulfilling her employer's legitimate performance expectations; and (3) she suffered an adverse employment action in that she was paid a lower salary than a "similarly situated" nonprotected class member. *Hildebrandt v. Ill. Dept. of Natural Res.*, 347 F.3d 1014, 1030-31 (7th Cir. 2003). To be "similarly situated," Dandy must show that her performance, qualifications, and conduct were comparable to the nonprotected class member in "all material respects." *Durkin v. City of Chicago*, 341 F.3d 606, 613 (7th Cir. 2003)*; Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002).

We must also reject Dandy's disparate compensation claim as she has failed to identify any "similarly situated" male or white employees who were given higher compensation. In her brief, Dandy lists the names of several white male UPS employees she alleges were of equal grade and position but paid higher salaries. However, she has not provided us with any necessary comparative evidence such as: (1) her current salary; (2) her past salary; (3) the salary of her comparitors during the relevant time period; (4) when her comparitors began working for UPS; or most importantly, (5) their qualifications, experience, or education. This court has held that an employee has failed to prove that she was "similarly situated" to her comparitors when she did not present evidence that she and coworkers shared the similar "attributes, experience, education, and qualifications relevant to the position sought. . . ." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618-19 (7th Cir. 2000). Without the necessary information and some cogent analysis on the part of the plaintiff, we must conclude that she has failed to meet her burden.

### E.   Dandy has not proven that she suffered retaliation.

To state a claim of retaliation, Dandy must prove: (1) that she engaged in statutorily protected activity; (2) that she

sustained an adverse employment action; and (3) a causal link between the protected activity and the employer's action. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). Dandy has failed to show that any adverse action was taken against her. Her retaliation claim is premised on her belief that she was illegitimately denied promotion opportunities. However, as discussed above, Dandy has not proven that she was qualified for a promotion; therefore, her promotion denial does not constitute an adverse employment action. *See Patt*, 280 F.3d at 754-55 (reasoning that plaintiff may not rely on previously rejected discrimination claim as basis for adverse employment action in retaliation charge). Dandy alludes to UPS's failure to transfer her to a full-time supervisor position in Arizona as a potential adverse employment action. However, because her request was for a lateral transfer offering parallel pay, benefits, and responsibilities, UPS's refusal to grant that request does not constitute an adverse employment action. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465-66 (7th Cir. 2002) (recognizing that this court has adopted a broad definition of adverse employment action but requiring evidence of some negative change in employment terms or status); *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612 (7th Cir. 2001) (holding that an adverse action must negatively alter material terms and conditions of employment).[7]

---

[7] Dandy asks that we remand her retaliation claim to the district court because it failed to substantively address it in its summary judgment order. We find that a remand is unnecessary as the court explicitly stated that it was granting UPS summary judgment on all of Dandy's claims. Furthermore, Dandy's retaliation claim simply rehashes her failure to promote claim, which the district court did substantively reject.

## III.  CONCLUSION

For the foregoing reasons, the district court's decision is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*