Dorothy CARR, Plaintiff–Appellant,

v.

WISCONSIN DEPARTMENT OF CORRECTIONS, et al., Defendants–Appellees.

No. 04–3192.

United States Court of Appeals, Seventh Circuit.

Submitted March 30, 2005.*

Decided March 30, 2005.

---

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

Trisha R. Stewart Martin, Milwaukee, WI, for Plaintiff–Appellant.

John R. Sweeney, Office of the Attorney General, Wisconsin Department of Justice, Madison, WI, for Defendants–Appellees.

Before BAUER, POSNER, and EASTERBROOK, Circuit Judges.

## ORDER

Dorothy Carr's employment with the Wisconsin Department of Corrections was terminated when she failed to respond to letters attempting to ascertain her ability to return to work after an extended medical leave. Convinced that she had repeatedly been denied work opportunities extended to her white coworkers and that discrimination motivated her firing, Carr filed this suit alleging violations of the Americans with Disabilities Act, the Rehabilitation Act, Title VII of the Civil Rights Act of 1964, and the Due Process Clause of the United States Constitution. The district court dismissed several of Carr's claims as barred by res judicata and concluded at summary judgment that the rest lacked merit. Carr appeals, and we affirm.

Carr began working at the Department in 1985 and served as a Supervising Youth Counselor at Ethan Allen School ("EAS").

Supervising Youth Counselors both provide individual instruction to juvenile offenders and perform management tasks like scheduling and record keeping. Carr did not perform the tasks typically associated with her title after 1997, however, when she returned from a medical leave necessitated by chest pains, depression, and uncorrectable vision problems, and was assigned a variety of light duty tasks at the school to accommodate her medical restrictions, which included limitations on pushing, pulling, lifting, typing, and repetitive tasks. In March 1998 Carr's doctor additionally restricted her from any more filing work, at which point the human resources director at the school determined that there were no positions at the school that Carr could perform. Carr was placed on an unpaid medical leave and told to report any changes in her medical restrictions that might allow her to return to work.

Carr remained on leave until July 2001, when her case came to the attention of Dennis Dokken, the Equal Opportunity Program Specialist for the Department. Dokken noted that Carr had been on leave for more than three years and decided either to reintegrate her into the workforce or terminate her employment. He wrote her and asked her to contact him so that they might investigate employment options that met her physical restrictions. Carr's counsel responded and scheduled a meeting, at which Carr presented notes from her neurologist and orthopedist stating that she could perform all the functions of a youth counselor except driving a truck. Dokken requested that Carr provide more specific information on the visual impairment that prevented her from driving, and she obtained a letter from her neurologist stating that she suffered from chemical burns and abrasions that rendered her incurably blind in her left eye, although she retained "reasonable vision"

in her right eye. Concerned that he still did not know the extent of Carr's impairment (for instance, whether it applied to driving vehicles other than a truck), Dokken scheduled her to be medically evaluated by an independent physician.

The exchange of letters that followed set the stage for both Carr's termination and her due process claim. In February 2002 Kyle Davidson, the superintendent of EAS, wrote Carr and asked that she submit to the medical evaluation. Davidson did not have Carr's current address, however, and the letter sent by certified mail was returned unopened. Davidson re-sent the letter to the same address, this time adding a request that Carr contact him by March 21, 2002, or face "further action by the institution." Carr did not receive this second letter, although the parties do not dispute that her attorney was copied on and in fact received both letters and informed Carr of their contents. When Davidson did not receive a response by the deadline he had set in his second letter, he sent a third letter terminating Carr's employment for insubordination.

The next month, however, Davidson decided that Carr should not have been fired without a pre-termination hearing, and sent her a letter rescinding her termination. He scheduled a hearing for May 2002 with the security director and human resources director of EAS. Carr attended the hearing with her attorney and explained that she had failed to respond to Davidson's letters because they had been sent to an old address. Although she admitted that her attorney had informed her of the letters' contents, she was under the impression that, due to her involvement in unrelated litigation against EAS, she was not supposed to contact the school directly. Indeed, the day after Davidson's March 21 deadline, Carr's counsel had faxed a letter to Dokken asking if Davidson's letters

meant that EAS intended to waive this "no contact" rule. Carr also noted that Dokken, a fellow Supervising Youth Counselor at EAS, and the school credit union had her current address. After conferring with the EAS personnel who had attended Carr's-hearing, Davidson sent her another letter on May 16, stating that "[w]hile the information you shared was informative, and helped us to understand the situation more fully, it did not change our ultimate decision to terminate your employment."

Carr originally filed this suit in Wisconsin state court, alleging that, since the early 1990s, she had been repeatedly passed over for promotions and training opportunities at EAS due to her race and disability. The defendants successfully removed the case to federal court, and Carr amended her complaint to include the events surrounding her termination. The district court subsequently granted the Department's motion to dismiss the majority of Carr's claims because she had already litigated and lost them in an earlier race and disability discrimination suit she had filed in that same court. The court held that any facts occurring prior to March 1998 had been included in the earlier suit; this suit was thus in effect limited to the circumstances surrounding her May 2002 termination. Carr thereafter pursued only the claims that her dismissal did not comport with due process and that she was fired because of her race and her complaints about race discrimination.

In July 2004 the district court granted the Department's motion for summary judgment on Carr's remaining claims. As to Carr's discrimination claim, the court held that she could not establish a Title VII violation because she could not show that she was treated less favorably than other similarly-situated employees who were not African–American. Although Carr had identified several white employees who had been disciplined for insubordination but not fired, the court concluded that these employees were not similarly situated because they did not have the same title or responsibilities as Carr, because they were union members and Carr was not, and because there was no evidence that their insubordination had been of the same type as Carr's. Alternatively, the court noted that Carr had not shown that the Department's stated reason for firing her—her failure to respond to letters negotiating a return to work—was pretextual. As with her race discrimination claims, Carr's retaliation claim failed due to her inability to identify similarly situated employees who had not complained about discrimination and were not fired. Finally, with regard to Carr's due process claim, the court held that Carr had failed to produce evidence that her pre-termination hearing was inadequate—the record showed that she had been permitted to enlist the aid of counsel to share her side of the story with impartial decisionmakers.

■ On appeal, Carr first argues that the district court erred when it concluded that she could not prove a Title VII claim for race discrimination because she failed to identify white employees who were similarly situated to her but treated more favorably. She suggests that the white coworkers she listed were similarly situated to her because they all broke the same rule that she did.

To establish that an employee who received more favorable treatment was "similarly situated" to her, a plaintiff must show that her performance, qualifications, and conduct were comparable to that employee's in all material respects. *Dandy v. United Parcel Serv.*, 388 F.3d 263, 274 (7th Cir.2004). This is a flexible determination, and the factors to be considered depend on the context of the particular case. *Herron*

*v. Daimlerchrysler Corporation,* 388 F.3d 293, 301 (7th Cir.2004). Typically a court will consider both employees' personal attributes, experience, and education. *Dandy,* 388 F.3d at 274.

The district court did not err in concluding that Carr failed to meet her burden of showing that similarly situated white employees were treated more favorably. Although Carr presented evidence that numerous youth counselors had been insubordinate and were not fired by EAS, she did not present any evidence about these employees' backgrounds, qualifications, or conduct on the job. A general allegation that others were treated better is not enough to survive summary judgment absent a showing of otherwise similar circumstances. *See Oest v. Ill. Dep't of Corr.,* 240 F.3d 605, 615 (7th Cir.2001). More importantly, Carr did not produce evidence regarding any employees who held the same position she did; she was a supervising youth counselor, not a youth counselor like the employees she identifies. This difference in rank alone is significant to the determination of whether employees are similarly situated. *See Hudson v. Chicago Transit Auth.,* 375 F.3d 552, 561 (7th Cir.2004) (employees not similarly situated because they had higher rank than plaintiff). Accordingly, the district court correctly granted summary judgment on Carr's race discrimination claim.

Carr also argues that the district court erred in concluding that her retaliation claim because she could not identify similarly-situated employees. But Carr rested her retaliation claim on the same evidence as her discrimination claim, and the analysis of whether the employees she identified were truly "similarly situated" is the same, *see Stone v. City of Indianapolis Public Util. Div.,* 281 F.3d 640, 644 (7th Cir.2002),

so summary judgment was also proper on the retaliation issue.

■ Finally, Carr argues that the district court erred in concluding that her pre-termination hearing satisfied due process. She argues that Davidson's letter demonstrates that the decision to terminate her had already been made before the hearing, which was merely a "sham" where no one intended to listen to her side of the story.

Due process requires that a public employee facing termination be given a meaningful opportunity to contest the reasons for her dismissal. *Cleveland Bd. Of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Baird v. Bd., of Educ. for Warren Cmty. Unit Sch. Dist. No. 205,* 389 F.3d 685, 690–91 (7th Cir. 2004). This includes oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to present her side of the story. *Dupuy v. Samuels,* 397 F.3d 493, 504 (7th Cir.2005). The hearing must be more than a mere sham; if the decision-makers have reached their conclusion prior to the hearing and refuse to consider the evidence, due process is not satisfied. *Scaife v. Racine County,* 238 F.3d 906, 908 (7th Cir.2001).

The district court was correct to conclude that Carr has not shown that her hearing was just a sham. Although it is perhaps unusual that Davidson sent Carr a letter, later rescinded, purporting to terminate her before her hearing, Carr has not pointed to any evidence that those who actually participated in her hearing, the security director and human resources director for EAS, were unwilling to listen to her version of events. *Cf. Ryan v. Ill. Dep't of Children & Family Servs.,* 185 F.3d 751, 762 (7th Cir.1999) (plaintiff survived summary judgment on due process claim by submitting testimony of case in-

vestigator and others involved in hearing that termination was inevitable "regardless of the evidence"); *de Llano v. Berglund*, 282 F.3d 1031, 1035–36 (8th Cir.2001) (hearing not merely a sham in absence of statement from hearing officers indicating their unwillingness to change their minds). Instead, the undisputed facts show that the officials conducting the hearing asked Carr questions and listened to her explanation of events, as ably supplemented by her counsel. The fact that the Department ultimately found Carr's explanations insufficient to save her from termination does not change the fact that she was given ample opportunity to deliver them. *See Dupuy*, 397 F.3d at 504.

Accordingly, the judgment of the district court is AFFIRMED.