In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 17-3143

FRED GATES,

*Plaintiff-Appellant,*

*v.*

BOARD OF EDUCATION OF THE CITY OF CHICAGO,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-CV-1394 — **Robert M. Dow, Jr.**, *Judge.*

_____

ARGUED SEPTEMBER 20, 2018 — DECIDED FEBRUARY 20, 2019

_____

Before MANION, HAMILTON, and SCUDDER, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Plaintiff Fred Gates testified that his direct supervisor, Rafael Rivera, addressed him with the N-word twice, and once threatened to write up his "black ass." The district court granted the employer's motion for summary judgment on Gates's claim for a racially hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2. In granting summary judgment for the defendant-employer, the district court noted that Gates

faced a high bar, "as '[t]he workplace that is actionable is one that is 'hellish.'" *Gates v. Board of Education of the City of Chicago*, No. 15-CV-1394, 2017 WL 4310648, at \*13 (N.D. Ill. Sept. 28, 2017), quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) (alteration in original). The court ultimately decided that Rivera's comments were not severe or pervasive enough to rise to the level of a hostile work environment, an adverse employment action that could entitle Gates to relief under Title VII. *Id.* at \*15.

The district court's analysis erred in two respects. First, it relied on the "hellish" standard, which is not a standard a plaintiff must satisfy. See *Jackson v. County of Racine*, 474 F.3d 493, 500 (7th Cir. 2007); *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 901 (7th Cir. 2018), quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22 (1993) ("Title VII comes into play before the harassing conduct leads to a nervous breakdown."). Second, the district court failed to focus on the difference in our hostile environment cases between having the plaintiff's co-workers show racial hostility and having the plaintiff's supervisor show racial hostility, especially in using such poisonous racial epithets as shown in the evidence here. See, e.g., *Robinson v. Perales*, 894 F.3d 818, 828–29 (7th Cir. 2018); *Rodgers v. Western-Southern Life Insurance Co.*, 12 F.3d 668, 675 (7th Cir. 1993). While we affirm all other portions of the district court's judgment, we reverse on the claim for a racially hostile environment.

I.  *Factual and Procedural Background*

   A.  *Facts Relevant to Summary Judgment*

Our account of the facts reflects the defendant Board's choice to move for summary judgment. As required, we give

plaintiff Gates the benefit of conflicts in the evidence and make reasonable inferences in his favor. *Terry v. Gary Community School Corp.*, 910 F.3d 1000, 1004 (7th Cir. 2018); *Johnson*, 892 F.3d at 893. The Board and its witnesses will be free to offer their own conflicting evidence at trial, and we do not vouch for the objective truth of Gates's testimony that we must credit in this appeal.

Gates is an African-American male born in 1965. He has been a building engineer with the Chicago Board of Education since 2004. In 2010, Gates was hired to fill the sole engineer position at William C. Goudy Technology Academy. He reported to school Principal Pamela Brandt until December 2012, when Rafael Rivera became his supervisor. Rivera was a facilities engineer who oversaw engineering work at sixteen schools, including Gates's. Because Rivera supervised so many schools, he and Gates saw each other in person only three times or so per month.

Gates's issues with Rivera began in June 2013. Gates testified that at a performance meeting that month, Rivera told him: "you will not be promoted because of your age and because you're black[.]" Despite Rivera's comment, Gates still applied for a promotion in July and August of 2013, which he did not receive. Gates testified that Rivera prevented him from getting a better job.

According to Gates, in the late summer of 2013, Rivera's behavior became increasingly offensive. Gates testified that on several occasions Rivera uttered racial epithets against him. Gates described one meeting with Rivera at his school in July or August of 2013. Rivera passed gas and then asked Gates why he did not laugh in response. Gates responded that he did not know why he should laugh or why it was funny.

Rivera said "you know what they call that[?]" Gates asked "call what?" and Rivera responded "[w]hen someone fart and a black guy's sitting there." Gates said "no," and Rivera answered, "you call that a shit-sniffing nigger." Gates claimed that he complained about this incident to Rivera's supervisor at the time, Ms. Bilqis Jacob-El. Gates testified that Jacob-El asked him whether he had told anyone else about the comment. He said no. She then instructed Gates to keep to himself the details of his encounter with Rivera.

Gates also claimed that in November 2013, Rivera again came to Gates's school and spoke with him. At this meeting, Rivera yelled at Gates, telling him "you will kiss the principal's ass to make her happy" or Rivera "would write [him] up, which would cause [Gates] to get low work evaluations and get fired." Gates testified later that Rivera specifically threatened to write Gates's "black ass up." Gates also testified that in a March 2014 meeting, Rivera ordered him to sit down, prompting the following exchange:

> I said I don't want to sit down, Rafael. He said, well, I'm your boss. I'm ordering you to sit down. So I said I'm not going to sit down. He said I'm tired of you people. I said who are you referring to? He said, nigger, you know what I'm talking about. So I walked out of the library.

On appeal, the Board argued that Rivera could not have exposed Gates to a racially hostile work environment because his interactions with Gates were too infrequent. The Board noted that Rivera made his offending comments over the course of six months, Gates saw Rivera only three times or so per month, and from November 2013 to November 2014, Gates worked only eleven days. (Gates was absent so often

because during that year he took multiple approved leaves from work, including bereavement leave for his father's death, a one-month sick leave, leave under the Family Medical Leave Act to care for his grandfather, and then a nearly one-month military leave.) Gates testified that he used the one-month sick leave in December 2013 to seek medical attention for homicidal thoughts he was experiencing towards Rivera, Principal Brandt, and his school's vice principal. The homicidal thoughts, Gates testified, were brought on by the discrimination he faced at work.

Rivera began to prepare a pre-discipline notice for Gates in December 2013 citing uncompleted work orders at Gates's school.[1] Rivera did not actually give this notice to Gates. Rivera later wrote up and issued Gates a different pre-discipline notice on March 17, 2014, just before the library incident. The notice told Gates to report to a pre-discipline hearing to address the issues with his performance on March 20, 2014. According to Gates, the library incident in which Rivera called him the N-word for a second time happened on March 17 or 18 of 2014. Rivera issued Gates a second pre-discipline notice on March 19, 2014 citing insubordination. The second notice scheduled a pre-discipline hearing on March 25, 2014. At the first pre-discipline hearing on March 20, Gates and a representative from his union met with Rivera. Gates told his union representative that he believed he was being discriminated against at work, and the representative advised him to hire an attorney. Gates did not attend the March 25 hearing because

---

[1] Pre-discipline notices notify employees that there is a problem with their work or behavior and that pre-discipline hearings will be held with employees and their union representatives to decide whether discipline is warranted.

he had been injured on the job in the meantime. No formal disciplinary action was taken against Gates. After his injury, Gates went on workers' compensation leave, and during that time began working a second job at the University of Illinois-Chicago. Rivera informed an employee with the Board's legal department that Gates had taken several extensive leaves and then found a second job. Gates believed that Rivera took this action to have him fired.

When Gates returned from his leave in November 2014, he was assigned to the Far South Side or Southwest Collaborative, a group of traveling building engineers who work at different schools throughout the southwest side of Chicago. In the position at William C. Goudy Technology Academy that Gates held before his leaves, he was a Class 3 engineer (the lowest-paid of three classes), earning around $82,000 to $87,000 a year.[2] When Gates testified at his deposition in 2016, he was a Class 2 engineer with the Southwest Collaborative earning between $94,000 and $97,000 a year.

B. *Proceedings in Civil Rights Agencies and the District Court*

Gates never filed a formal internal complaint with the Board about the discrimination he says he suffered. Instead, on April 14, 2014, he filed a formal charge of discrimination with the Illinois Department of Human Rights and the United States Equal Employment Opportunity Commission. The EEOC issued Gates a notice of his right to sue. Gates then filed a five-count complaint against the Board in the district court

---

[2] The term Chief Engineer was abolished in 2012 under the terms of a collective bargaining agreement. When the title was in use, it applied automatically to any building engineer appointed to a school with only one engineer—so Gates was the Chief Engineer at Goudy.

alleging age and race discrimination and retaliation. The Board eventually moved for summary judgment on all claims, and the district court granted the motion. *Gates v. Board of Education of the City of Chicago*, No. 15-CV-1394, 2017 WL 4310648, at *1 (N.D. Ill. Sept. 28, 2017).

As the district court noted, neither Gates's complaint nor his answers to the Board's interrogatories said that Rivera had ever used the terms "black," "black ass," "age," or the N-word. *Id.* at *7. Those specifics surfaced for the first time during Gates's deposition testimony. The district court carefully considered whether to treat those portions of his testimony as part of the summary judgment evidence and ultimately decided to consider this testimony. That was probably the correct decision, and in any event that point is not disputed on appeal. Still, the district court concluded that Gates could not sufficiently establish that he suffered a racially hostile work environment in violation of Title VII. The court explained that "the threshold for plaintiffs is high, as "[t]he workplace that is actionable is one that is 'hellish.'" *Id.* at *13, quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997). The harassing conduct, the court continued, must be severe or pervasive and Rivera's behavior towards Gates was neither. *Id.* at *14–15.[3]

---

[3] The district court also granted summary judgment for the Board on Gates's other claims for age and race discrimination based on a denial of a promotion and the pre-discipline notices plus a negative performance review, as well as his retaliation claims based on a denial of a promotion and the pre-discipline notices plus a negative performance review. *Gates*, 2017 WL 4310648, at *13, *17–18. Gates does not challenge those aspects of the judgment on appeal.

II. *Analysis*

A. *Standard of Review*

We review *de novo* the district court's grant of summary judgment. *Jackson v. County of Racine*, 474 F.3d 493, 498 (7th Cir. 2007); *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 894 (7th Cir. 2018); *Whitaker v. Wisconsin Dep't of Health Services*, 849 F.3d 681, 684 (7th Cir. 2017). Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In our review, we "constru[e] all facts, and draw[] all reasonable inferences from those facts, in favor of the nonmoving party." *Whittaker v. Northern Illinois University*, 424 F.3d 640, 644–45 (7th Cir. 2005), quoting *Telemark Development Group Inc. v. Mengelt*, 313 F.3d 972, 976 (7th Cir. 2002).

B. *Racially Hostile Work Environment*

The district court ruled that Gates provided insufficient evidence to establish that he was subject to a hostile work environment. To prevail on a Title VII claim, a plaintiff must show that

> [1] he is a member of a class protected by the statute, [2] that he has been the subject of some form of adverse employment action (or that he has been subjected to a hostile work environment), and [3] that the employer took this adverse action on account of the plaintiff's membership in the protected class.

*Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018), quoting *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013). Subjecting an employee to a hostile work environment counts as an

adverse action ("unlawful employment practice") within the meaning of Title VII's prohibition of race discrimination in 42 U.S.C. § 2000e-2(a). E.g., *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 980, 982 (7th Cir. 2014).

To prove that an employment environment was actionably hostile, a plaintiff must show that "(1) he was subject to unwelcome harassment; (2) the harassment was based on race (or another protected category); (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability." *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018), citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66–72 (1986), *Johnson*, 892 F.3d at 900–01, and *Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017); see also *Johnson*, 892 F.3d at 900.[4] Relevant to this inquiry are "the severity of the alleged conduct, its frequency, whether it [wa]s physically threatening or humiliating (or merely offensive), and whether it unreasonably interfere[d] with the employee's

---

[4] "Sometimes our cases phrase the test differently, looking instead for evidence that the workplace was both subjectively and objectively offensive—either in lieu of the first prong—that the employee was subject to unwelcome harassment—or the third prong—whether the harassment was severe or pervasive enough to rise to the level of a hostile work environment." *Johnson*, 892 F.3d at 900, citing *Cole v. Board of Trustees of Northern Illinois University*, 838 F. 3d 888, 896 n.6 (7th Cir. 2016); see also *Alexander*, 739 F.3d at 982 (requiring plaintiffs to show "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability."). "In the end, we have concluded that the inquiry is the same" under these different phrasings of the test. *Johnson*, 892 F.3d at 900, citing *Cole*, 838 F.3d at 896 n.6.

work performance." *Robinson*, 894 F.3d at 828; see *Jackson*, 474 F.3d at 499; see *Whittaker*, 424 F.3d at 645. To withstand summary judgment, Gates needed to provide evidence sufficient to allow a reasonable jury to find that Rivera's conduct "was severe or pervasive enough to constitute a hostile work environment." *Robinson*, 894 F.3d at 828.

The district court identified these inquiries properly but erred in their application. Most important, the court incorrectly stated that "the threshold for plaintiffs is high, as "[t]he workplace that is actionable is one that is 'hellish.'" *Gates*, 2017 WL 4310648, at *13, quoting *Perry*, 126 F.3d at 1013 (alteration in original). While a "hellish" workplace is surely actionable, plaintiffs' evidence need not show a descent into the Inferno. In 2007, we rejected the so-called "hellish" standard in *Jackson v. County of Racine*, 474 F.3d at 500, and in other decisions after the district court's decision in this case, such as *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d at 901, we have again made the point. In *Jackson* we said that language in our earlier opinions indicating that an environment must reach the point of "hellishness" before becoming actionable is impossible to reconcile with *Harris v. Forklift Systems, Inc.*, where the Supreme Court wrote:

> Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers … The appalling conduct alleged in *Meritor*, and

> the reference in that case to environments "so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers," merely present some especially egregious examples of harassment. They do not mark the boundary of what is actionable.

510 U.S. at 22, quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). In *Jackson*, pointing to this same passage from *Harris*, we clarified: "The Supreme Court's decision in *Harris* established that something short of the Ninth Ring" may violate Title VII. *Jackson*, 474 F.3d at 500; see also *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017) ("a workplace need not be 'hellish' to constitute a hostile work environment"), citing *Jackson*, 474 F.3d at 500.

The issue is whether the discriminatory conduct Gates testified to qualifies as sufficiently severe *or* pervasive to alter the conditions of his work environment. The principal racial harassment Gates described was at the hand of Rivera. Three incidents are key: (1) the 2013 "joke" in which Rivera called Gates the N-word; (2) the 2013 meeting in which Rivera threated to write up Gates's "black ass"; and (3) the 2014 "you people" comment in which Rivera again addressed Gates using the N-word.[5] The district court decided at summary judgment that as a matter of law, this level of harassment from a

---

[5] Gates pointed to additional harassing conduct including the pre-disciplinary notices that Rivera issued him, racially offensive conduct by Principal Brandt, and Rivera's general pattern of speaking to Gates in a "demeaning and unprofessional manner." However, the three incidents discussed here are the most severe comments actually considered by the district court at summary judgment and are sufficient for us to decide that

supervisor was not severe or pervasive enough to render an employee's work environment hostile. The court concluded that our precedents showed generally "that one or two utterances of the N-word are not severe or pervasive enough to rise to the level of establishing liability absent an unusually severe, physically threatening, or humiliating incident." *Gates*, 2017 WL 4310648, at *14. The district court's analysis is flawed, however, because it overlooked the fact that in most of the cases it cited rejecting hostile work environment claims, a *co-worker* as opposed to a *supervisor* uttered the racially offensive language. This distinction is critical in general, and in this case. See *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 601 (7th Cir. 2014) (affirming summary judgment for employer; one use of racial epithet and several other incidents of harassment by co-workers were not severe or pervasive enough to establish hostile work environment); *Smith v. Northeastern Illinois University*, 388 F.3d 559, 562 n. 2, 566–67 (7th Cir. 2004) (affirming summary judgment on one of plaintiff's hostile environment claims where that plaintiff heard defendant—who may or may not have been her supervisor—utter only one racist comment not directed at her); *Rodgers v. Western-Southern Life Insurance Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (multiple instances of supervisor using the N-word in employee's presence established actionable hostile work environment); *Shanoff v. Illinois Dep't of Human Services*, 258 F.3d 696, 698–99, 705–06 (7th Cir. 2001) (hostile work environment claim should have withstood summary judgment motion

the district erred in granting summary judgment to the Board on Gates's Title VII hostile work environment claim. They are also the only three comments that Gates used on appeal to argue that his work environment was offensive enough subjectively and objectively to be actionable.

where plaintiff's supervisor repeatedly harassed him with derogatory comments about his race and religion).[6]

We have repeatedly treated a supervisor's use of racially toxic language in the workplace as much more serious than a co-worker's. See, e.g., *Robinson*, 894 F.3d at 828–29; *Rodgers*, 12 F.3d at 675; see also *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 271 (7th Cir. 2004) (use of the N-word by supervisors has particularly severe impact on work environments). This is particularly true when supervisors address these derogatory and humiliating remarks directly to the employees in question. See *Johnson,* 892 F.3d at 902 ("Comments made to non-plaintiff co-workers carry less weight in the evaluation of a hostile environment claim, but they are not irrelevant."); *Dandy*, 388 F.3d at 271 (in evaluating whether offensive language created hostile work environment, it is necessary to note "whether the remarks were stated directly to the plaintiff or whether the plaintiff heard them secondhand[.] That is not to say that racial epithets *must* be stated directly to a plaintiff to create an objectively hostile work environment. Repeated use of such highly offensive terms … may create an objectively hostile work environment, even if they are heard secondhand."), citing *McPhaul v. Board of Commissioners of*

---

[6] The district court found more direct support in *Roberts v. Fairfax County Public Schools*, 858 F. Supp. 2d 605, 609 (E.D. Va. 2012), where a supervisor (a teacher) threatened her subordinate and called her by the N-word. The case came before the Eastern District of Virginia court on Defendant Fairfax County Public School's motion for summary judgment. *Id.* at 606–07. The court held that this conduct was not severe or pervasive enough to create a hostile work environment. *Id.* at 609–11. But this decision runs contrary to our circuit's precedents that distinguish between supervisor and co-worker conduct as well as between direct and indirect harassment.

*Madison County*, 226 F.3d 558, 567 (7th Cir. 2000), overruled on other grounds by *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).

In *Rodgers v. Western-Southern Life Insurance Co.*, we affirmed a verdict for an employee where his supervisor used the N-word multiple times in his presence and made several other racially offensive comments. *Rodgers*, 12 F.3d at 671, 676–78. We explained: "Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment,' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Id.* at 675, quoting *Meritor*, 477 U.S. at 67. "[A] supervisor's use of the [N-word] impacts the work environment far more severely than use by co-equals." *Id.* at 675.

In *Johnson v. Advocate Health and Hospitals Corp.*, we evaluated plaintiffs' claim that their "supervisors subjected [them] to offensive and derogatory racial comments, creating a hostile work environment." 892 F.3d at 893. Plaintiffs testified that their supervisors made racially-charged comments directly to them and others and used the N-word in their presence. *Id.* at 901–03. We held that evidence that supervisors engaged in this atrocious conduct "should allow a reasonable jury to find that each of the plaintiffs experienced a racially hostile working environment." *Id.* at 904.

In *Robinson v. Perales*, we considered a hostile work environment claim where Robinson, a biracial police officer with the University of Illinois at Chicago presented evidence that Perales, his lieutenant and supervisor, used the N-word in his presence on two occasions, once in reference to Robinson himself. 894 F.3d at 823–24. The district court granted defendant

Perales summary judgment on Robinson's hostile work environment claim. We reversed the district court's judgment "that a few instances of the use of this particular epithet [the N-word] were not significant enough to meet the standard for hostile environment." *Id.* at 828. We emphasized that "Perales was not simply a co-worker; he was a supervisor with direct authority over Robinson." *Id.* at 828.

In short, when the harassment involves such appalling racist language in comments made directly to employees by their supervisors, we have not affirmed summary judgment for employers.

The district court also found that the harassment Gates described was too infrequent to be pervasive (three racial slurs in a sixth-month period of a four-year employment), not objectively offensive, and not "particularly 'severe,' physically threatening, or humiliating." *Gates*, 2017 WL 4310648, at \*15**.** In support of its holding, the district court cited cases that fit into one of four distinguishable categories: (1) the alleged actions or comments were comparably horrific to using the N-word but were done or said by a co-worker, not a supervisor; (2) the actions or comments alleged were made by a supervisor but were more ambiguous or significantly less offensive than addressing an employee with the N-word; (3) the alleged remarks were very offensive and made by a supervisor but were not spoken directly to the plaintiff; or (4) the conduct or remarks were evaluated under the now-rejected "hellish" standard. *Id.* at \*13–15. See *Nichols*, 755 F.3d at 601 (co-worker using racial epithet); *McPherson v. City of Waukegan*, 379 F.3d 430, 434–35, 439 (7th Cir. 2004) (several sexually-suggestive comments along the lines of asking the colors of plaintiff's and others' bras and underwear did not alone establish hostile

work environment); *Patt v. Family Health Systems, Inc.*, 280 F.3d 749, 751, 754 (7th Cir. 2002) (no actionable hostile work environment because of eight gender-based comments by then surgery department chief, when only two such comments were made directly to plaintiff and neither referred to her specifically);[7] *Baskerville v. Culligan International Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (applying "hellish" standard, court did "not think that these incidents [sexually-harassing comments], spread over seven months, could reasonably be thought to add up to sexual harassment."); *North v. Madison Area Ass'n for Retarded Citizens-Developmental Centers Corp.*, 844 F.2d 401, 409 (7th Cir. 1988) (two or three offensive statements that at most "*might* be considered as racial slurs" did not establish "a sufficiently pervasive atmosphere of racial harassment"); *Poullard v. McDonald*, 829 F.3d 844, 858–59 (7th Cir. 2016) (no actionable hostile work environment where primary allegations concerned three incidents of supervisor harassment that had at best "a tenuously arguable connection to race"; the supervisor comments made "were at worst mild and ambiguous");[8] *Ford v. Minteq Shapes & Services, Inc.*, 587 F.3d 845, 846–48 (7th Cir. 2009) (co-worker's comments referring to plaintiff Ford as "black man" and "black African-American," Ford's supervisor's comment that "he didn't have

---

[7] The defendants' brief in the *Patt* case made clear that "only two of the alleged comments were heard by Dr. Patt [plaintiff] directly" and that "Dr. Patt acknowledge[d] that neither of the references were directed toward her and admitted that neither statement offended her." Brief for Defendants-Appellees at 26, *Patt v. Family Health Systems, Inc.*, 280 F.3d 749 (7th Cir. 2002) (No. 00-2948).

[8] The district court here cited the district court opinion in *Poullard*. See *Gates*, 2017 WL 4310648, at *15, citing *Poullard v. Shinseki*, No. 12 C 7497, 2015 WL 1428105, at *11 (N.D. Ill. Mar. 26, 2015).

to worry about losing his job because Minteq [employer] wanted to appear integrated[,]" another supervisor's comment calling Ford a gorilla, and Minteq not letting Ford bring his grandchildren to work Christmas parties did not amount to hostile work environment); *Whittaker v. Northern Illinois University*, 424 F.3d 640, 644–45 (7th Cir. 2005) (no actionable hostile work environment where gender-based comments were made "outside [plaintiff's] presence, and there [was] no evidence that she was aware of these defendants' remarks during her tenure with [employer].").

Gates testified to quite different circumstances. His supervisor used race-based epithets including the N-word directly and in reference to him. The district court acknowledged the severity of Rivera's epithets, but its analysis did not address the significance of the differences between supervisors and co-workers and between direct and indirect harassment that are important in hostile work environment cases. *Gates*, 2017 WL 4310648, at *14, citing and quoting *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) ("there is no 'magic number of slurs'" needed to show hostile work environment, and "an unambiguously racial epithet falls on the 'more severe' end of the spectrum"); *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) ("Given American history, we recognize that the word 'nigger' can have a highly disturbing impact on the listener.").

If the only evidence of racial harassment Gates had was a *co-worker's* use of the three epithets uttered by Rivera, we would likely reach a different conclusion in this case. Given Rivera's position as Gates's supervisor, however, if a jury credits Gates's testimony about Rivera's comments, it could reasonably find that Gates suffered an actionable hostile work

environment. Whether conduct is "'sufficiently severe or pervasive to alter the conditions of employment' … depends on 'the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance.'" *Johnson*, 892 F.3d at 900, quoting *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). A jury would likely have a difficult time concluding that a supervisor calling his employee the "N-word" and threatening to write up his "black ass" were not examples of harassing comments motivated by race. Although Rivera's conduct was relatively infrequent and not "physically threatening" or "humiliating" in a public setting, it was severe and humiliating. A reasonable jury could also find that it did interfere with Gates's work performance, not least because it led him to take a leave from work to seek medical treatment. Supervisor conduct as severe and direct as described in Gates's testimony cannot be deemed insufficiently severe or pervasive as a matter of law.

C. *Waiver & Forfeiture of Remaining Claims*

Gates is entitled to a trial on his hostile environment case, but he waived or forfeited all of his remaining claims. He argues, though, that he did not forfeit his Title VII retaliation claim in the district court. We disagree. The Board's motion sought summary judgment on all claims. In opposing summary judgment in the district court, Gates failed to assert that he was subject to a hostile work environment *in retaliation* for complaining about the discrimination he says he suffered. He did not specifically argue that Rivera or Principal Brandt created a hostile work environment because he reported their

discriminatory conduct to Jacob-El or the EEOC. Gates did argue that he was retaliated against, but only in the form of not being promoted and being written up by Rivera. In his summary judgment memorandum, Gates also discussed two of the instances of racially-harassing conduct that he used to support his hostile work environment claim—the incident in which Rivera threatened to write up his "black ass" and the library incident in which Rivera used the N-word. However, he never specifically argued that this conduct was retaliatory. Perhaps Gates could have linked those incidents to his claims of retaliation, but he did not. The district court was not required to address a claim or theory that plaintiff did not assert.

The district court's grant of summary judgment on Gates's hostile work environment claim is REVERSED and the case is REMANDED for further proceedings on that claim consistent with this opinion. In all other respects, the judgment of the district court is AFFIRMED.