In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 16-2291 & 16-3390

ANTHONY ROBINSON ,                           *Plaintiff-Appellant/*
                                             *Cross-Appellee,*

and

TIMOTHY SPANGLER,                            *Plaintiff-Appellant,*


                        *v.*


ALFRED PERALES,                              *Defendant-Appellee/*
                                             *Cross-Appellant,*

and

BOARD OF TRUSTEES OF THE
UNIVERSITY OF ILLINOIS, *et al.*,            *Defendants-Appellees.*

―――――――――

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cv-04859 — **Harry D. Leinenweber**, *Judge.*

―――――――――

ARGUED JANUARY 5, 2018 — DECIDED JULY 2, 2018

―――――――――

Before KANNE, ROVNER, and HAMILTON, *Circuit Judges*.

ROVNER, *Circuit Judge.*  Anthony Robinson and Timothy Spangler, police officers employed by the University of Illinois at Chicago Police Department ("Department"), brought claims against the University of Illinois Board of Trustees and four individuals for race-based discrimination, harassment and retaliation. The district court disposed of all but one of the claims through summary judgment. Robinson then prevailed at trial on a claim for retaliation against his supervisor, Alfred Perales, recovering nominal damages. The district court denied Robinson's motion for a new trial and to alter the judgment. The court also declined to award attorneys' fees to Robinson and denied Perales's motion for judgment as a matter of law. Robinson, Spangler and Perales all appeal. We affirm in part and vacate and remand in part.

## I.

"Once a jury has spoken, reviewing the record as a whole, 'the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1018 (7th Cir. 2016) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). We discuss this standard more fully below and to the extent that we are considering the facts as found at trial, that is the standard we employ. The appeal also challenges the grant of summary judgment on two counts, and for that purpose we similarly construe the facts in favor of the nonmoving parties, drawing all reasonable inferences in their favor.

Robinson, who describes himself as biracial, began working as an officer with the Department in 2008.[1] Perales, a lieutenant who is Hispanic, was his direct supervisor. Perales reported to Division Commander Frank Cappitelli (who is white), and Cappitelli reported to Chief John Richardson (who is African-American). In late January 2012, Perales asked Robinson why he did not shave his facial hair in compliance with the Department's grooming policy. Robinson had brought in a doctor's note seeking an exemption from the shaving requirement because of a skin condition.[2] The note was deemed inadequate and Perales directed Robinson to visit the University's Health Services Department to obtain an exemption.

In mid-February, Robinson met with Perales again to discuss the shaving issue. Lieutenant Eric Hersey, who is African-American, was also present at this meeting. Perales

---

[1] In his deposition, Robinson explained that his father is black and his mother is white. R. 61-2, at 14.

[2] Robinson has a form of folliculitis, a painful and disfiguring skin condition that "most often occurs in the beard and neck areas of black men with tightly curled hair who shave." The condition occurs when facial hair penetrates the skin before leaving the hair follicle or when the hair leaves the follicle and then curves back into the skin. The resulting inflammation can lead to infections and scarring. "The best preventive treatment is to stop shaving and allow the hair to grow. When the hairs are longer, they do not curl back and puncture the skin." *See* https://www.merck manuals.com/home/skin-disorders/hair-disorders/ingrown-beard-hairs (last visited June 26, 2018). The prevalence of the condition in African-American men is reported to be between 45 and 85%. *See* Dermatologic Conditions in Skin of Color: Part II, https://www.aafp.org/afp/2013/0615/p859.html (last visited June 26, 2018).

decided to tell Robinson that his inquiry into the shaving requirement was not racially based and so he described to Robinson his past experiences with racism:

> [Robinson] came and sat at my desk and basically said that he felt that I was picking on him because of his ethnicity, that he was African American, at which point I related to him, "Stop right there. Let me tell you how things have been in my career." And I related a story to him about how early on in my career I was approached by both UIC officers and Chicago police officers, and I refer to it as the "good-old-boy network," and they used to tell me— and I used the N word, I used the word "nigger," although it's very offensive to me to even repeat it, I used it in the context to say that officers used to say, "We don't back those N word—we don't hang out with those guys, you shouldn't do that."

> And my response to him, and I'm speaking to Officer Robinson, was that I used to tell them, meaning the UIC and CPD officers, that would use that type of language that I didn't condone it, that I didn't appreciate them talking like that around me. I considered myself to be a Hispanic, also a minority, and it was offensive to me then. So I then related to Officer Robinson, "So, please, Anthony, don't put that moniker on me. That's not what I'm about."

R. 61-4, at 103–04 (Deposition of Alfred Perales).[3] In Robinson's version of this conversation, Perales recounted that Chicago police officers used to say to him that "We don't back n----rs up, you know, we don't help n----rs," and Perales claimed that he told those officers, "That's not me." Tr. at 65. Robinson denied that he was the person who raised the issue of racism, instead asserting that Perales gave this speech gratuitously after Robinson asked why his doctor's note was insufficient proof of his condition.

After the meeting, Lieutenant Hersey, who was shocked by Perales's use of this "ugly" epithet, told Perales that it was inappropriate for a supervisor to use that word in that setting. Hersey did not report the incident because he assumed that Perales was in "report-writing mode," where officers sometimes have to repeat the exact words used by others in a report or in a conversation with a state's attorney. But Hersey believed that Perales, as a supervisor, should not have used that word with a subordinate in this situation.

Unfortunately, despite Perales's denial that he was the kind of racist who used the word "n----r," Robinson presented evidence that Perales was that kind of racist. Several weeks after the February discussion, in March 2012, Perales again

---

[3] We include this highly objectionable word once because it is the slur actually employed by Perales (he concedes his use of the word on this first occasion), and because persons conducting research on case law relevant to the use of this word in employment cases must be able to find applicable precedent. We will hereafter use "n----r" in every instance where the word was alleged to have been spoken, and we will use the euphemistic "n-word" where that is the actual term used by the parties.

called Robinson to his office. Robinson told Perales that he had scheduled a doctor's appointment, and then invited Perales to look at the bumps and scars on his face caused by shaving. Perales responded, "[O]h, yeah, I see it, it must be the n----r in you." Another officer, Stephen Pawlik, who was standing in the hallway, overheard Perales's comment.

Although Robinson did not complain about Perales's first use of this slur, in mid-March he submitted a grievance through the Metropolitan Alliance of Police about the second occurrence. He was then asked to file a sworn complaint as part of the UICPD disciplinary process, and he did so on May 29, 2012. Internal Affairs completed its investigation into the incident in June, and recommended a five-day suspension for Perales. Chief Richardson instead imposed a twenty-day suspension.

During the investigatory period and after Perales returned from his suspension, Robinson noticed that Perales was subjecting him to a high level of scrutiny and following him while he was on duty. Spangler, the watch commander for Robinson's shift, and Pawlik, Robinson's frequent patrol partner, also noticed that Perales was keeping a closer watch on Robinson than he was on other officers. Shortly after Robinson filed his grievance, Perales and Hersey directed Spangler to "go against" Robinson and Pawlik and "get some shit on them and write them up." They also told Spangler, who had authority as a sergeant and commander of the third watch, not to give Robinson and Pawlik anything they wanted or asked for such as time off or special assignments. Hersey said that Spangler had to take action so that Perales would seem uninvolved. Spangler replied that he would treat all officers

the same, and he did not comply with the directive. Another officer reported to Robinson that Perales told the officer that Robinson and Pawlik needed to "watch [their] asses." Robinson reported this remark in a second grievance and filed a complaint with Internal Affairs asserting that Perales had threatened him. Perales was found not to have engaged in any wrongdoing but was ultimately reassigned to another division where he was no longer Robinson's direct supervisor. According to Robinson, Perales was transferred to Internal Affairs, the division charged with investigating the kinds of complaints that Robinson had lodged against Perales. In late 2012, Robinson was passed over for a promotion to sergeant.

After refusing to take action against Robinson and Pawlik, Spangler received two unwarranted notices of infraction under the disciplinary process, each of which put him in fear of losing his job. The first notice was rescinded and, after Spangler filed a grievance about it, Chief Richardson concluded that the notice of infraction was unfounded. The Chief also decided that the second notice was "not sustained." Following these incidents, Spangler was bumped out of his position as third watch commander by Cappitelli, who first discussed his decision with Perales. Spangler filed both a grievance and charge of retaliation related to his demotion from the command position on the third watch.

Robinson and Spangler filed a nine-count complaint against Perales, Hersey, Cappitelli, Richardson, and the Board of Trustees of the University of Illinois. Robinson asserted claims of racial harassment (Count I), racial discrimination (Count II), and retaliation (Count III) against the Board under Title VII and against the individual defendants under section 1981.

Robinson also alleged violation of his equal protection rights (Count IV) under section 1983 against the individual defendants. Spangler brought claims for retaliation (Count V) and race discrimination (Count VI) against the Board under Title VII and against the individual defendants under section 1981. Spangler also asserted a violation of the equal protection clause (Count VII) against the individual defendants under section 1983, and a claim under the Illinois Whistleblower Act (Count VIII) against all the defendants. Finally, Robinson brought a claim for retaliation under the Family and Medical Leave Act (Count IX) against all defendants. The defendants moved for summary judgment and the district court granted judgment in favor of the defendants on all claims except for Robinson's claim against Perales and the Board for retaliation. That claim went to trial, where the jury found against Perales and in favor of the Board, awarding Robinson nominal damages of one dollar. The district court subsequently denied Robinson's motion for a new trial and to alter the judgment. The court also declined to award attorneys' fees to Robinson and denied Perales's motion for judgment as a matter of law. Robinson, Spangler and Perales all appeal.

## II.

On appeal, Robinson contends that the court erred when it granted summary judgment in favor of the defendants on his claim for discrimination based on hostile environment. Robinson also asserts that the court erred during the trial when it found that the Board could escape liability for the retaliation committed by Perales. Robinson further argues that the jury was provided with improper verdict forms and that the court incorrectly concluded that he was not entitled to attorneys'

fees. Spangler challenges the district court's grant of summary judgment in favor of the defendants on his claim for retaliation. Perales cross-appeals in order to challenge the district court's refusal to grant him judgment as a matter of law on Robinson's retaliation claim.

## A.

Robinson sued both Perales and the Board for retaliation. The jury found against Perales but for the Board on this claim. Robinson argues on appeal that, because Perales was a supervisor, a finding of liability for Perales requires a finding of liability against the Board, citing *Volk v. Coler*, 845 F.2d 1422 (7th Cir. 1988), in support. That case noted that an employer is strictly liable for harassment by supervisory personnel who have the power to hire, fire, or promote, and that an employer is liable for harassment by nonsupervisory employees only when it has actual or constructive notice of the harassment. 845 F.2d at 1436. *See also Vance v. Ball State Univ.*, 646 F.3d 461, 469–70 (7th Cir. 2011), *aff'd*, 570 U.S. 421 (2013) (employers are strictly liable for harassment inflicted by supervisors, where supervisors are persons with power to directly affect the terms and conditions of the plaintiff's employment primarily through the authority to hire, fire, demote, promote, transfer, or discipline the employee, but employers can assert an affirmative defense when the harassment does not result in a tangible employment action.).

But Robinson did not request any instructions allowing the jury to impute liability against Perales to the Board. There was no instruction, for example, telling the jury how to decide if Perales met the definition of "supervisor." Nor did any

instruction direct the jury to hold the Board liable if it found against Perales and determined that Perales met the definition of "supervisor." Instead the jury was instructed to consider the liability of each defendant separately. Special verdict forms were presented for each defendant, asking the jury, among other things, whether Robinson proved by a preponderance of the evidence that he suffered a materially adverse employment action by each defendant. The jury answered "yes" to that question on the verdict form for Perales and "no" on the verdict form for the Board. Robinson's failure to present to the jury this theory of strict liability for the employer amounts to a waiver of the claim. *Fox v. Hayes*, 600 F.3d 819, 841–42 (7th Cir. 2010) (plaintiff waived theory of liability on appeal where the theory was not raised in the district court and the jury was not instructed on it).

If that failure to request appropriate jury instructions and the failure to object to the instructions and verdict forms employed were not enough to constitute a waiver of this issue, there is more. During deliberations, the jury sent out a note asking about this very issue:

> THE COURT: All right. Here is the latest message I received at 3:16: "Judge Leinenweber, is the jury able to find for the Board of UIC but against defendant Alfred Perales? Foreperson, … ." The answer is "yes." Any objection if I say that?
>
> [COUNSEL FOR PLAINTIFF]: Can you read the question again, Judge?

> THE COURT: "Is the jury able to find for the Board of UIC but against defendant Alfred Perales?"
>
> [COUNSEL FOR PLAINTIFF]: Yes.
>
> [COUNSEL FOR DEFENDANTS]: I think that's accurate.
>
> THE COURT: Pardon?
>
> [COUNSEL FOR DEFENDANTS]: I think that is accurate.
>
> THE COURT: Okay. I'll say "yes." Okay, Thank you.

R. 117, Tr. at 627. Counsel for Robinson expressly waived the issue now raised by conceding during this exchange that the jury could find against Perales and in favor of the Board. *United States v. Smith*, 818 F.3d 299, 302 (7th Cir. 2016) (counsel affirmatively waives any challenge to a court's response to a jury question when counsel indicates unmistakable approval for the court's proposed answer to the jury); *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 712 (7th Cir. 2014) (a party waives any theory not presented to the jury even if the theory is legally sound and supported by the evidence at trial).

Robinson similarly waived the challenge he raises on appeal to the special verdict forms. Robinson contends that the special verdict forms were vague and improperly suggestive. Robinson did not raise this objection on the record in the district court. Although he asserts that he did not have an adequate opportunity in the district court to object to the verdict forms, the record indicates that the court allowed both sides adequate opportunities to object to the jury instructions

and verdict forms. *MMG Financial Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 659 (7th Cir. 2011) (failing to object to a special verdict form on particular grounds waived the argument as to those grounds on appeal); *Orix Credit All., Inc. v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 477–78 (7th Cir. 1997) (same). In any case, there is nothing improper with the verdict forms used. The form directed the jury to "[s]tate the amount of Plaintiff's actual damages: $ _____ (state the amount or, if you find that Plaintiff's damages do not have a monetary value, write in the nominal amount of One Dollar ($1))." Nothing in this wording suggested that the plaintiff's damages did not, in fact, have a monetary value, as Robinson contends.[4]

## B.

Robinson also challenges the district court's grant of summary judgment in favor of the defendants on his claim for discrimination based on a hostile environment. To succeed on a claim for hostile environment, a plaintiff must demonstrate that: (1) he was subject to unwelcome harassment; (2) the harassment was based on race (or another protected category); (3) the harassment was severe or pervasive to a degree that

---

[4] Our finding that Robinson waived his objections to the jury instructions and verdict form should not be construed as an endorsement of their language regarding nominal damages. At the defendants' suggestion, the district court employed phrasing from the Eighth Circuit pattern instructions. Our circuit's pattern instructions do not use this language, which might be misunderstood as steering a jury toward an award of nominal damages when damages are difficult to calculate. The Seventh Circuit's civil pattern instruction 3.10 instead makes clear that difficulty in assigning a dollar value to physical, mental and emotional pain and suffering does not preclude substantial monetary awards for such losses, when appropriate.

altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66–72 (1986); *Johnson v. Advocate Health & Hosps. Corp.*, — F.3d —, —, 2018 WL 2753066, *8 (7th Cir. June 8, 2018); *Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017). In determining whether conduct is severe or pervasive enough to alter the conditions of employment, courts must consider the severity of the alleged conduct, its frequency, whether it is physically threatening or humiliating (or merely offensive), and whether it unreasonably interferes with the employee's work performance. *Johnson*, — F.3d at —, 2018 WL 2753066 at *8; *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). Without considering the circumstances as a whole, the district court concluded that a few instances of the use of this particular epithet were not significant enough to meet the standard for hostile environment.

We disagree. "Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury." *Johnson*, — F.3d at —, 2018 WL 2753066, at *8. If a reasonable jury could find that the conduct was severe or pervasive, then the claim must go to trial. Perales's multiple uses of the word n----r in combination with his heightened scrutiny of Robinson and his call to others to take action against Robinson are sufficient to create a triable issue for a jury on whether the harassment was severe or pervasive enough to constitute a hostile work environment.

First, the district court misstated the applicable legal standard, declaring that the conduct at issue must be "severe **and** pervasive" rather than "severe **or** pervasive." The require-

ment is disjunctive, not conjunctive; the standard may be met by a single extremely serious act of harassment or by a series of less severe acts. *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013); *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 693 (7th Cir. 2001).

Second, we have noted more than once that, in light of its threatening use throughout American history, this particular epithet can have a highly disturbing impact on the listener. *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004); *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004). *See also Virginia v. Black*, 538 U.S. 343, 355 (2003) (noting that the Ku Klux Klan vowed to "keep n----rs out of your town" as part of its campaign of racial violence and intimidation). Indeed, African-American Lieutenant Hersey, a defendant in this case who was present the first time that Perales used this slur, testified that this is an "ugly word" that shocked him when he heard Perales use it. Hersey in fact confronted Perales about his use of this slur as soon as Robinson left the area, telling Perales that it was inappropriate for a supervisor to use this word at the university.

Third, Perales was not simply a co-worker; he was a supervisor with direct authority over Robinson. "Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment,' *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405, than the use of an unambiguously racial epithet such as 'n----r' by a supervisor in the presence of his subordinates." *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993). *See also Dandy*, 388 F.3d at 271 (supervisor's use of the term "n----r" impacts the work environment far more severely than use by co-equals). Indeed,

Perales used this slur not just in the presence of a subordinate (as occurred in *Rodgers*) but directed the epithet at the subordinate himself.

The district court agreed that this language was humiliating but the court noted that the first time Perales used this language, he was quoting the language of other officers in "apparent disapproval." Perales's speech to Robinson employed apophasis, the rhetorical device of denying one's intention to speak of a subject that is at the same time mentioned or insinuated. *See* Webster's Unabridged Dictionary of the English Language, RHR Press (2001). The use of this device has the effect of emphasizing the subject while maintaining plausible deniability. *See* [www.merriam-webster.com/ dictionary/apophasis](http://www.merriam-webster.com/dictionary/apophasis) (last visited June 26, 2018). In other words, Perales denied that he was racist or that he used words like "n----r" by using the highly objectionable term multiple times as part of his purported denial.

Although Perales employed the language of denial when delivering the first few instances of this epithet, the court should not have construed that fact in Perales's favor on summary judgment. A reasonable jury could find that, especially in light of Perales's later use of the term to directly disparage Robinson, Perales's use of apophasis was really meant to distance himself from liability while still deriving the desired effect of disturbing the listener.

The court also remarked that the impact of language not directed at the plaintiff is not as great as the impact of language that is so directed. In support, the court cited *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004). In *Smith*, the

plaintiff never personally heard the defendant utter the word "n----r" and it was never used in reference to her; its use was reported to her by other workers. On a single occasion, she heard the defendant call her colleagues "black motherf----rs." We held that this single instance spoken in the plaintiff's presence and not directed at her was insufficient to meet the standard. In contrast, Perales used the word "n----r" multiple times in Robinson's presence, first to deny that he was racist or that his motive in pursuing his grooming policy complaint was racially motivated and then to disparage Robinson directly. Indeed, his second use of the term was directly in reference to Robinson's failure to conform to the grooming policy, attributing his inability to shave to being a "n----r." This makes his initial denial all the more suspect, and a reasonable jury could find that the denial was itself meant as a disparagement or as a cover for his true motive in pursuing the grooming issue. Construed in Robinson's favor, the two instances were intended to disparage and humiliate Robinson.

Fourth, the district court failed to consider the totality of Perales's conduct, separating some of the conduct out into retaliation instead of including it as part of the harassment. A jury could consider all of Perales's conduct towards Robinson, including his unusually close surveillance of Robinson and his directives to others to "get shit" on Robinson in order to write him up, and deny him benefits that he wanted such as time off or special assignments. When considered along with Perales's repeated use of the word "n----r," there was a triable issue of fact regarding whether Perales's conduct was severe or pervasive enough to meet the standard for hostile environment. That Robinson was able to continue preforming his job

well is not dispositive, as the defendants suggest. Interference with work preformance is only one factor among many in the calculus. *Johnson*, — F.3d at —; 2018 WL 2753066, at *8. Resilient employees who manage to perform well in trying circumstances may still prove a hostile environment claim. The parties do not dispute that there were genuine issues of material fact on the other factors for a hostile work environment claim, and so this claim should have gone to the jury.

## C.

Spangler challenges the district court's grant of summary judgment in favor of Perales and the Board on his claim for retaliation. In order to make out a claim for retaliation, a plaintiff must demonstrate (1) that he engaged in statutorily protected activity; (2) that his employer took a materially adverse action[5] against him; and (3) that the protected activity and the adverse action are causally connected. *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016); *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 881 (7th Cir. 2014); 42 U.S.C. § 2000e–3(a). To prove causation, the plaintiff must show that "the desire to retaliate was the but-for cause of the challenged employment action." *Gracia*, 842 F.3d at 1019 (quoting *University of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)). "This requires proof that the unlawful retaliation would not have occurred in the absence of the

---

[5] Some of our cases describe this requirement as a materially adverse **employment** action. The Supreme Court has made clear, however, that materially adverse actions and harms are not limited to those related to employment or to the workplace in the retaliation context. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).

alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360. A materially adverse action is one which might well have dissuaded a reasonable worker from engaging in protected activity such as making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68. The harm is judged by an objective standard but context matters: as the Court noted, a retaliatory schedule change, for example, may not be significant for some employees but may matter enormously to a parent with young children. *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68–69. An act that is immaterial in some situations might be material in others. *Id*. *See also Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661–62 (7th Cir. 2005) (although "petty bureaucratic nastiness" might not be enough to meet the materiality requirement for an employee bringing a retaliation claim on her own behalf, when an employee is supporting a colleague's charge of discrimination, this lesser retaliation might induce the employee to withhold support because "it takes less to deter an altruistic act than to deter a self-interested one," possibly meeting the standard in that circumstance).

Spangler presented evidence that, on March 22, 2012, shortly after Robinson filed a grievance complaining about Perales's use of the word "n----r," Perales and Hersey called Spangler into a meeting. Spangler was Robinson's watch commander at that time. In the meeting, Perales told Spangler to follow Robinson and Pawlik around and "get some shit on them, and write them up." Perales specifically said to keep an eye on Robinson and "write him up for anything [he] could find." R. 57-3, at 232–33. Perales also told Spangler to deny Robinson and Pawlik any special assignments and time off that

they requested. According to Spangler, Perales gave these directives as he was complaining about the allegations that Robinson raised against Perales. Perales included Pawlik as a target for retaliation because he was a witness to Perales's use of the word "n----r" against Robinson. Perales told Spangler that Robinson and Pawlik were a threat to all supervisors and that Spangler could not allow officers to "take down" supervisors. Spangler understood the directive to include writing up the pair on false charges, not simply on valid infractions. Hersey then told Spangler that Perales was right and that everything had to be accomplished through Spangler so that Perales would seem uninvolved. Spangler refused, telling Perales and Hersey that he "was going to treat the officers all the same." He then left the meeting. R. 57-3, at 242.

The very next day, Hersey served an unfounded Notice of Infraction on Spangler. Two months later, Perales issued Spangler another unfounded Notice of Infraction. Although both charges were ultimately dropped (after Chief Richardson deemed them unfounded), Spangler was soon demoted from his position as watch commander, "not down to the alternate watch commander but all the way down to street sergeant." Spangler had been a watch commander for four years at that point. The demotion reduced Spangler's pay rate. According to Spangler, Perales told him directly that he (Perales) made the decision to demote Spangler. Cappitelli, however, said that, although he consulted Perales about the decision to replace Spangler with another sergeant, the decision was his (Cappitelli's) alone to make. Cappitelli then named Todd Edwards, who is African-American, to replace Spangler as watch commander. Edwards wanted to select Spangler as the

alternate watch commander but was directed by Cappitelli to instead select Stan Grice, who is also African-American. Spangler inferred that the selection of African-American replacements was intended to protect Perales from Robinson's charge of discrimination.

The district court found that Spangler had produced enough evidence to create genuine issues of material fact on the issues of protected activity and materially adverse action. Spangler's refusal to retaliate against Robinson for complaining about Perales's racist words and actions certainly constitutes protected activity. Spangler was opposing an unlawful employment practice under Title VII when he refused to engage in retaliation against a subordinate who filed a good-faith complaint of discrimination. 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any … employee[] … because he has opposed any practice made an unlawful employment practice by this subchapter."). Supporting a colleague's charge of discrimination by refusing to retaliate against that colleague is protected activity. *Washington*, 420 F.3d at 661–62. The court also correctly concluded that the defendants arguably took materially adverse actions against Spangler. A jury could find that the false notices of infraction are the kind of "petty bureaucratic nastiness" that might dissuade a co-worker from supporting an employee's charge of discrimination. Most importantly, the demotion from watch commander to street sergeant, with its attendant reduction in pay, clearly qualifies as a materially adverse action.

But the district court granted summary judgment to the defendants after concluding that Spangler could not show

causation. The court found that Cappitelli alone made the decision to demote Spangler, and that Cappitelli was not aware that Spangler had engaged in protected activity. The court characterized as hearsay Spangler's testimony that Perales admitted that he had made the decision. Because the decision-maker did not know that Spangler had engaged in protected activity, the court concluded that Spangler failed to create a genuine issue of material fact on causation.

But Perales's admission that he made the decision to demote Spangler was not hearsay. Federal Rule of Evidence 801(d)(2)(A) provides that a statement is not hearsay if the "statement is offered against an opposing party and … was made by the party in an individual or representative capacity." *See also Jordan v. Binns*, 712 F.3d 1123, 1128–29 (7th Cir. 2013) ("[t]here are only two requirements for admissibility under FRE 801(d)(2)(A): a statement was made by a party, and the statement was offered against that party"). Both elements are easily met here. Perales is a party and he purportedly made the statement to Spangler. Spangler now offers Perales's statement against Perales.[6] That is sufficient to create a genuine issue of material fact regarding who made the decision. *Peele v. Burch*, 722 F.3d 956, 961 (7th Cir. 2013) (statements by a party to the case that are used against that party are not hearsay under

---

[6] To the extent that Spangler wishes to offer this statement not only against Perales but also against the Board, it is arguably admissible under Rule 801(d)(2)(D), as an admission of a party's agent within the scope of the agency. *See Baines v. Walgreen Co.*, 863 F.3d 656, 662 (7th Cir. 2017); *Simple v. Walgreen Co.*, 511 F.3d 668, 672 (7th Cir. 2007). In either case, the court erred in characterizing the statement as inadmissible hearsay on summary judgment.

Rule 801(d)(2)(A), and may be used as evidence of improper retaliatory motive).

Moreover, Cappitelli conceded that he consulted Perales before deciding to demote Spangler. A jury could conclude that, even if Cappitelli was the ultimate decision-maker and even if Cappitelli himself lacked a retaliatory motive, Perales caused him to demote Spangler with a retaliatory motive by way of the "cat's paw" theory. *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 711 (7th Cir. 2017). That theory applies "when a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015). The plaintiff must provide "evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action." *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013).

Whether Perales made the decision to demote Spangler directly as he admitted to Spangler, or by duping Cappitelli into doing the deed for him, Perales clearly was aware that Spangler had engaged in protected activity, and Perales arguably had a retaliatory motive. Spangler has also presented additional evidence of causation, including the timing of the retaliatory acts and evidence that the reasons stated for demoting him and replacing him with Edwards are pretexts for the true cause. On the timing issue, Spangler has evidence that he faced a false Notice of Infraction the day after he refused to retaliate against Robinson. This is an especially

telling piece of evidence because Spangler had just refused to make false charges against Robinson and Pawlik. A jury could find that Perales and Hersey were sending him a message that they would subject him to that same treatment (false charges) if he did not comply. After a second false Notice of Infraction, Perales demoted (or arranged the demotion of) Spangler. Watch commanders were reassigned every six months and Spangler was demoted at the defendants' first opportunity to take action against him.

In sum, Spangler presented adequate evidence that Perales, who had an obvious motive to retaliate, either made the decision to demote Spangler or influenced the person who did so. Hersey's first false Notice of Infraction came within a day of Spangler refusing to make false charges against Robinson; Perales's false Notice followed soon after, and then Spangler, who had been a watch commander for four years, was unceremoniously demoted. There is enough to send Spangler's claim of retaliation to a jury.

## D.

After Robinson prevailed at trial on his retaliation claim, Perales moved for judgment as a matter of law. *See* Fed. R. Civ. Proc. 50. The district court denied the motion, and Perales filed a cross-appeal. Perales contends that Robinson failed to prove that Perales took materially adverse actions against him or that Robinson's complaint was the cause of any actions taken by Perales. According to Perales, two recent cases hold that mere heightened scrutiny does not meet the standard for a materially adverse action: *Boss v. Castro*, 816 F.3d 910 (7th Cir. 2016), and *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866

(7th Cir. 2016). Perales also took exception to the district court's failure to consider certain evidence he presented at trial.

Our review of the district court's denial of the motion for judgment as a matter of law is *de novo*. *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004). The standard for judgment as a matter of law mirrors the standard for summary judgment:

> [I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. … Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (internal citations and quotation marks omitted). The district court ably applied this standard and we find no error in the court's conclusions. There is nothing to Perales's claim that the district court failed to consider certain evidence presented at trial; the court considered the evidence that *Reeves*

required the court to consider and disregarded evidence that the court must disregard under *Reeves*.

We noted above that a materially adverse action is one that might well dissuade a reasonable worker from engaging in protected activity. Although it is an objective standard, context matters. Part of the context here is the paramilitary police environment that involves officers relying on each other for backup in dangerous situations. As the district court noted, this was not simply a case of heightened scrutiny applied to the employee's performance. The jury was entitled to believe evidence that "Perales actively planned to damage or perhaps even end Robinson's career as a UIC police officer and that he attempted to enlist others in that effort." We agree with the district court that it "defies common sense to argue that such behavior would not deter a reasonable employee from lodging future complaints." A reasonable jury could find that Perales's conduct was designed to suppress dissent. We also agree with the district court's conclusion that the jury was entitled to accept Spangler's testimony as proof that Robinson's filing of the grievance was the but-for cause of Perales's retaliation.

*Boss* and *Bagwe* are distinguishable on their facts. Boss was subjected to a performance improvement plan, was required to substantiate his time off, and had to reschedule one day of "telework." He received an unfavorable performance review that downgraded him from "highly successful" to "fully successful," a change that had no tangible job consequence. Not only did he suffer no tangible job consequences from these petty slights, he had no evidence that some of these actions were tied to his filing of an EEOC complaint, failing on causation as well. *Boss*, 816 F.3d at 919. Bagwe also faced a

performance improvement plan but had no evidence that the motive was retaliatory. Nor could she show that an investigation launched after she complained of pay discrimination was founded on an improper motive. Although she was ultimately terminated, she failed to meet her burden of proof on causation by not tying her termination to any protected activity. *Bagwe*, 811 F.3d at 889–90.

In contrast, Robinson was subjected not simply to increased surveillance but to a campaign designed to damage or end his career as a UIC officer, and his superiors enlisted others, including his watch commander, to aid them in this goal. This is the kind of conduct that would dissuade a reasonable officer from making a complaint in the first place. That Robinson made additional complaints is not relevant to the objective test regarding the effect the defendants' actions would have on a reasonable person. "Our job at this stage is not to determine whether the jury believed the right people, but only to assure that it was presented with a legally sufficient basis to support the verdict." *Harvey*, 377 F.3d at 707. The jury was presented with an adequate basis here for finding in favor of Robinson on his claim for retaliation.

### E.

Finally, we turn to Robinson's appeal of the district court's order denying his request for attorneys' fees. A court may, in its discretion, award attorneys' fees to prevailing parties in certain civil rights actions. *See* 42 U.S.C. § 1988(b); *Farrar v. Hobby*, 506 U.S. 103, 108 (1992). Perales does not dispute that Robinson qualifies as a prevailing party. Robinson obtained an enforceable judgment against the defendant from whom fees

are sought, and that judgment directly benefitted him, thereby altering the legal relationship of the parties. *Farrar*, 506 U.S. at 111. A plaintiff who wins even nominal damages is a prevailing party under section 1988. *Farrar*, 506 U.S. at 112.

The district court exercised its discretion to deny fees in this instance because of the extremely limited success Robinson achieved in relation to the relief he sought. The district court noted that it dismissed all but one of Robinson's claims on summary judgment, and at trial, one defendant was vindicated and the other defendant was ordered to pay only one dollar in damages. Compared to the amounts Robinson sought at trial, this was a negligible recovery, the court concluded, and not worthy of an award of fees. That the jury absolved the Board suggested to the district court that this was a mere personal victory without any accompanying public benefit. We review that decision for abuse of discretion. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (a district court has discretion in determining the amount of a fee award under section 1988); *Baker v. Lindgren*, 856 F.3d 498, 503 (7th Cir. 2017) (court's review of a section 1988 fee award is limited to whether the district court abused its discretion).

Under *Farrar*, the most critical factor in determining the reasonableness of a fee award is the degree of success obtained. 506 U.S. at 114. "When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, … the only reasonable fee is usually no fee at all." *Farrar*, 506 U.S. at 115. Robinson asserts that he did not request any particular amount from the jury and so he was fully vindicated by the award of nominal damages. And that brings us to the second example of

apophasis in this case, which occurred during Robinson's closing argument:

> It takes us to the damages section of the verdict form. And I'm not going to stand here and tell you what we think this is worth, what we think or what Officer Robinson thinks that this is worth to him. That's going to be your job. But I'm going to ask you what value you put on your ability to go to work in an environment where you aren't constantly worried about retaliation that might come at you from all sides. Going to the workplace, you don't know who to trust.
>
> What is that worth to you? Is it worth $50,000? Is it worth $200,000? Is it worth $300,000? That's something that we, the plaintiff, are going to leave up to the jury to decide. That's going to be listed on the verdict form as the actual damages. … The last question … deals with punitive damages. That's the way that the jury can send a message to Lieutenant Perales that this kind of action, this kind of conduct is unacceptable. … And I'll ask what kind of message you want to send. Is that $500,000? Is that more? Again, it's up to you to decide[.]

Tr. at 590–91.

In supposedly declining to name a number or ask for a particular amount, Robinson's counsel suggested figures ranging from $50,000 to $300,000 in compensatory damages and $500,000 or more in punitive damages. Framing a request for $800,000 or more by denying that you are asking for any

particular amount is a clever rhetorical device but it is still a request for a particular amount. The district court did not abuse its discretion in treating this language as a request for a particular amount and gauging the one dollar award against it. We see no abuse of discretion in the decision to deny Robinson any attorneys' fees.

On remand, however, the court will be faced with a different situation that may result in a better outcome for Robinson and Spangler. We are vacating summary judgment on two counts—one for each plaintiff. If the trial of those counts (or a settlement of those counts) results in more than nominal damages, the court will have to engage in this analysis anew, using the new figures as part of the equation.

### III.

We vacate the summary judgment in favor of the defendants on Robinson's claim for racial harassment and Spangler's claim for retaliation, and remand those claims for trial. We affirm the district court's judgment denying Perales's motion for judgment as a matter of law and denying Robinson's motion for attorneys' fees. We affirm the judgment in all other respects.

AFFIRMED IN PART;

VACATED AND REMANDED IN PART.