In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-1473

JEFFERY JOHNSON,

*Plaintiff-Appellant,*

*v.*

ACCENTURE LLP,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
No. 1:21-cv-03285 — **Manish S. Shah**, *Judge.*

ARGUED JANUARY 9, 2024 — DECIDED JULY 2, 2025

Before ROVNER, HAMILTON, and JACKSON-AKIWUMI, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* Jeffery Johnson, who is Black, reported racial discrimination while working on a client project at Accenture LLP. Accenture's internal investigation found that Johnson's complaint was made in good faith but lacked merit. Johnson had trouble getting staffed on subsequent projects and was eventually fired. He sued Accenture claiming, as relevant here, the company illegally retaliated

against him for reporting discrimination. The district court awarded Accenture summary judgment and dismissed the case.

Johnson was indeed terminated because he had difficulty finding projects, and that did happen after he complained of racial discrimination. But the record before us is insufficient to support Johnson's argument that his complaint *caused* his difficulty getting staffed on projects and his termination. Thus, we must affirm. But not without noting that our conclusion is governed by the record and binding case law, not blindness to the reality Johnson presses—that bias affected aspects of his work experience. *See* Jerry Kang et al., *Implicit Bias in the Courtroom*, 59 UCLA L. Rev. 1124, 1159 (2012) (explaining that the "conventional legal model" can miss employment discrimination where "employment decisions might be motivated by implicit bias but rationalized post hoc based on non-biased criteria").

## I

We present the following facts in the light most favorable to Johnson as the party opposing summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, we do not consider the additional pages of Johnson's deposition that he submitted to us but failed to submit to the district court. *See Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1013 (7th Cir. 2021) ("[A]s a general rule we will not consider evidence on appeal that was not before the district court.").

Accenture provides clients with project-based professional services. Accenture employees apply internally to be staffed on a project. An employee not currently on a project is

said to be on the company's "bench." Employees on the bench receive their full salary but are expected to find new projects. Accenture monitors the time employees spend on the bench and company guidelines provide for termination after eight weeks without client work.

Johnson started at Accenture in January 2018 as an Application Development Associate Manager. During his first year, he worked on three projects without incident. After completing the third project, he spent nearly three months on the bench. Lisa Quiroz was a Talent Fulfillment Specialist assigned to support Johnson during this period. Quiroz advised Johnson on how to find new projects, said that she was proposing him as a candidate for open roles, and warned him that if he was unable to get staffed on a project, he risked being fired.

In February 2019, Johnson joined a project for client Dana Holding Corporation (Dana Project). His first day on the project, he perceived what he believed was racial discrimination. Specifically, an Accenture employee refused to serve as his administrative assistant on the project; Johnson believed this was because he was Black. (Johnson later learned that the employee was never assigned to be his assistant.) Then, the project's client manager told Johnson that the Black employee Johnson replaced was "inadequate" and "not smart enough." The client manager also warned Johnson to "tread lightly" around a German employee at Dana, whom Johnson identifies only as Anya. Johnson reported these concerns to human resources that first day.

Johnson remained on the Dana Project. He tells us that he continued to observe racist, hostile, and combative acts, particularly from Anya. After working on the project for about a

month, Johnson reported his concerns about Anya to Rick No-
ble, an Accenture senior manager assigned to the Dana Pro-
ject. Noble told Johnson that the client was intimidated by
Johnson's deep voice and recommended he try raising his
voice a few octaves. Johnson interpreted Noble's comments
as racist and as condoning Anya's racist behavior. Four days
later, Johnson called Accenture's human resources hotline to
report racial discrimination and a hostile work environment.

Accenture policy advised employees who made com-
plaints of discrimination to remove themselves from their
projects while human resources investigated their com-
plaints. So, Johnson informed Noble he would not be contin-
uing with the project and added that he was not comfortable
working in an unhealthy environment. Accenture's human
resources department investigated Johnson's claims, includ-
ing by interviewing Johnson and Noble, but ultimately con-
cluded the claims were without merit.

During his interview, Johnson informed the human re-
sources investigator, Shelly Amick, that he was willing to re-
turn to the Dana Project. No one in human resources informed
the Dana Project leaders that Johnson wanted to rejoin the
project. Johnson reaffirmed his willingness to return while
meeting with human resources at the close of the investiga-
tion. But Amick and Quiroz continued to advise Johnson to
seek another project.

After taking that advice and departing the Dana Project,
Johnson had another lengthy spell on the bench. In late April,
another Accenture manager, Nishant Jain, considered adding
Johnson to the Cargill Project. Jain asked Michael Hancock, an
Accenture team leader, for feedback on Johnson's Dana Pro-
ject performance. When Hancock received this request for

feedback, he emailed Noble, "Was this the guy that walked out?" Noble responded, "YES!" Hancock then notified Jain that Johnson "walked off the project" and "left us in a bad spot with the client." A member of human resources saw this email exchange and encouraged Jain to instead seek feedback from one of Johnson's earlier projects, noting that there were "extenuating circumstances" on the Dana Project. Jain did so and received positive feedback about Johnson, but ultimately decided to bring on another employee who already had a relationship with the client.

In May, Johnson finally joined a new project: Johnson & Johnson. However, he was removed for performance reasons after only eight days. Johnson's manager explained in an email at the time that Johnson had flown home without notifying the project, was "reluctant to cooperate with the team," created work product "[f]ar below [an] acceptable level of quality," and did not read his email carefully.

After more time on the bench, Johnson joined one final project which he completed without incident at the end of August. Afterwards, Johnson returned to the bench. Quiroz again coached Johnson on how to secure assignments and personally recommended him for staffing on projects. Despite this, Johnson remained on the bench for nearly three months, at the end of which he was fired. According to Accenture, he was terminated for spending too many consecutive weeks on the bench.

Following the termination, Johnson sued Accenture for racial discrimination and retaliation under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. Accenture moved for summary judgment. The district court determined that Johnson's summary judgment filings violated Northern District of

Illinois Local Rule 56.1(d) by presenting several assertions without appropriate citation and by offering facts that were either legal conclusions or irrelevant to Accenture's claims. Consequently, the court struck from the record many of Johnson's facts and admitted several of Accenture's facts as uncontroverted. What remained, the court decided, did not show that Johnson had been discriminated against based on his race. The court also ruled that Johnson provided insufficient evidence for his retaliation claims. For these reasons, the court awarded Accenture summary judgment on all of Johnson's claims.

Johnson now appeals the district court's grant of summary judgment but only as to his retaliation claims under § 1981 and Title VII. Johnson does not appeal the loss of his race discrimination claims.

## II

There is one matter to address before we discuss Johnson's retaliation claims. Johnson challenges the district court's decision to admit many of Accenture's proposed undisputed facts as uncontroverted. But Johnson's responses to the relevant facts were non-responsive, unsupported, or both. The district court was therefore well within its discretion to enforce Local Rule 56.1 and admit Accenture's facts. *See McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 787 n.2 (7th Cir. 2019) ("We give substantial deference to a judge's decision to strictly enforce local summary-judgment rules, reversing only for abuse of discretion.").

Turning to the merits, we review a summary judgment decision de novo and construe the record in the light most favorable to the nonmoving party. *Adebiyi v. S. Suburban Coll.,*

98 F.4th 886, 891 (7th Cir. 2024). To survive summary judgment, a plaintiff must point to specific evidence creating a genuine dispute for trial. *Anderson*, 477 U.S. at 250.

### A. § 1981 Claim

Section 1981 states that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." The rights protected under the statute apply to "nongovernmental discrimination." 42 U.S.C. § 1981(c).

To avoid summary judgment on a § 1981 retaliation claim, the plaintiff must show a genuine dispute about whether "(1) the plaintiff engaged in a statutorily protected activity; (2) the employer took a materially adverse action; and (3) there is a causal connection between the two." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 404 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008) (recognizing retaliation claims under § 1981). Johnson does not present his argument using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), so we evaluate the evidence as a whole, *see Ortiz v. Werner Enterprises*, 834 F.3d 760, 766 (7th Cir. 2016). *See also Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (explaining that courts use the same frameworks to evaluate Title VII and § 1981 retaliation claims).

Johnson undisputedly engaged in protected activity when he reported discrimination on the Dana Project. And he identifies five adverse employment actions: (1) Accenture's failure to reinstate him to the Dana Project; (2) Accenture's failure to staff him to the Cargill Project; (3) Accenture's failure to reinstate him to the Johnson & Johnson Project (J&J Project); (4)

Accenture's failure to select him for other consulting projects; and (5) Accenture's decision to terminate him. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024) (explaining a plaintiff must show disadvantageous change in employment term or condition but need not show "significant" harm).

That leaves the question of causation: has Johnson shown, or can a jury infer, a causal link between his report of discrimination and the adverse actions he experienced? To show causation in the retaliation context, the protected activity need not be the "only cause of the adverse action," but the plaintiff must be able to show the protected activity was a "but for" cause, meaning that "the adverse action would not have happened without the activity." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013)). The plaintiff may rely on direct or circumstantial evidence of retaliation, including "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019).

The district court concluded that Johnson could not meet his burden of showing causation, so a trial was not warranted. Limited as we are to the record before us, we must agree. We take each adverse action in turn.

### 1.  *Dana Project*

Johnson argues that Accenture's failure to reinstate him to the Dana Project after his complaint of discrimination was retaliatory. Accenture argues that there is no causal connection

between Johnson's complaint and its decision not to reinstate him to the project.

In the district court, Johnson focused his arguments on the suspicious timing of the failure to reinstate coming soon after his complaint of discrimination. But timing alone is "rarely sufficient" to show causation. *O'Leary v. Accretive Health*, Inc., 657 F.3d 625, 635 (7th Cir. 2011).

On appeal, Johnson adds that a jury could infer retaliation because he wanted to rejoin the Dana Project but was refused that opportunity. Only he does not provide any direct or circumstantial evidence that the decision was retaliatory. Johnson states that Noble or Hancock (or another unnamed Accenture representative) actively refused to reinstate him to the Dana Project. But Johnson does not suggest how a jury could infer bias given he does not show that any Accenture policy favored reinstatement and there is no evidence anyone with the ability to reinstate him was aware that he wanted to return to the project. The only people Johnson says knew of his desire to return were Amick and Quiroz. And Johnson provides no basis for a jury to infer that Amick or Quiroz had retaliatory animus that caused them to recommend that he find a new project instead of recommending he be reinstated. Therefore, Johnson's evidence of a causal link between his complaint of discrimination and this adverse action is insufficient.

### 2. *Cargill Project*

While on the bench after the Dana Project, Johnson applied for a position on the Cargill Project. Johnson states that he was offered the position contingent on feedback from former supervisors. Accenture says that it never extended Johnson an offer. Either way, it is undisputed that as part of the

hiring process, Jain, the hiring manager, reached out to Hancock for feedback on Johnson's performance on the Dana Project. Hancock stated that Johnson had "walked off the project" and "left [them] in a bad spot with the client." Jain, at human resources' urging, received positive feedback about Johnson from another project, but ultimately selected another candidate.

On appeal, Johnson argues that Noble's bias against him ultimately caused his rejection from the Cargill Project. This theory of causation is known as cat's paw, which applies when (1) a subordinate actually harbored retaliatory or other unlawful animus against the employee, and (2) the subordinate's scheme proximately caused the adverse action. *Robinson v. Perales*, 894 F.3d 818, 832 (7th Cir. 2018). Even assuming Johnson can meet his burden to show Noble harbored actual animus against him, Johnson cannot meet his burden to show Noble proximately caused the adverse action.

Johnson argues that Noble's email to Hancock—which answered "YES!" to Hancock's question about whether Johnson "walked out" on the Dana Project—"falsely advised" that Johnson left that project without cause and resulted in Jain not selecting Johnson for the Cargill Project. But any causal chain between Noble's email and Jain's decision was broken by three subsequent developments: human resources informed Jain that Johnson had "extenuating circumstances" during the Dana Project, Jain received other (positive) feedback about Johnson, and Jain ultimately hired an employee who had previously worked with the client (something Johnson does not contest). *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (explaining that there is no proximate cause where the casual links are "too remote, purely contingent, or indirect").

Johnson points to no other evidence to suggest Noble's bias infected Jain's decision.

In sum, Johnson has not offered sufficient evidence from which a jury could find that Noble proximately caused Johnson's rejection from the Cargill Project.

### 3. *Johnson & Johnson Project*

After not getting staffed on the Cargill Project, Johnson landed an assignment with the J&J Project. But he was removed for performance reasons just eight days after he began. Johnson argues that his removal was improper and the failure to reinstate him was retaliatory. However, the record Johnson developed does not tell us if he ever requested to be reinstated, who denied him reinstatement, what reasons that decision-maker gave for the denial, or anything else specifically related to the J&J Project. Instead, Johnson speculates that Noble must have worked behind the scenes to dissuade other project managers from staffing Johnson. Speculation is not enough to survive summary judgment. *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021) ("[A] court need not give credence to facts based on speculation or conjecture."). There is no evidence in the record from which a jury could infer that Noble or anyone else compromised Johnson's ability to successfully complete the J&J Project. And without such evidence, Johnson cannot demonstrate a causal link between his complaint of discrimination and his separation from the J&J Project.

### 4. *Other Accenture Projects*

Johnson asserts that Noble's retaliatory animus thwarted his selection for three additional Accenture projects. Again, Johnson offers only speculation that Noble spoke with and

provided false statements to the hiring managers for these projects. Without support in the record, Johnson's beliefs are not enough to survive summary judgment. *See Gupta*, 19 F.4th at 997.

### 5. *Termination*

After Johnson spent ten weeks on the bench, Accenture Senior Managing Director Pallavi Verma terminated him. Johnson argues that Verma's decision was based on the recommendations of Maren Krause and Bryan Basset, and their recommendations were products of the retaliatory animus that Noble, McQuin, and Quiroz each harbored against him. Specifically, Johnson posits that Noble made false statements about his performance on the Dana Project, and those false statements prevented him from working on several projects including Cargill and J&J. As for McQuin and Quiroz, Johnson says neither of them investigated his retaliation complaints, and neither interceded on his behalf when Krause and Basset recommended his termination. But again, Johnson relies on a cat's paw theory, so Johnson must show a causal link between the actual bias of non-decisionmakers and the termination decision. *See Robinson*, 894 F.3d at 832. Johnson makes no argument that Krause or Basset harbored actual bias against him or even knew about his complaint of discrimination. That leaves McQuin, Quiroz, and Noble.

Even assuming Noble, McQuin, and Quiroz each harbored retaliatory animus against him, Johnson does not develop a causal link to the termination decision. Johnson would have to show that the animus of Noble, McQuin, and Quiroz so infected the termination decision as to make Verna "a dupe in a deliberate scheme to trigger a discriminatory

employment action." *Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015).

But Johnson does not point us to any record evidence to build the casual chain between Noble's animus and Verna's decision to terminate Johnson for being on the bench too long. *See Robinson*, 894 F.3d at 832. As for McQuin and Quiroz, Johnson presents no evidence that their animus caused the termination. Johnson argues that they failed to intervene on his behalf when Krause and Basset recommended his termination. But Johnson does not explain what would compel them to intercede. He points to no policy, practice, or testimony to support his theory.

Finally, Johnson maintains that his termination was pretextual. Accenture insists Johnson was terminated for spending too many consecutive weeks on the bench. To show pretext, Johnson needs to show the employer's "proffered reason was … a lie," which can be demonstrated by implausibility, inconsistency, or contradiction in the reason for termination. *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937–38 (7th Cir. 2022). Johnson presents no legally cognizable evidence to suggest that Accenture's stated reason—that Johnson spent too much time on the bench—was pretextual. As such, his claim that his termination was retaliatory fails.

We understand Johnson's argument that his career went downhill after he complained of racism at work. It is possible that Johnson was subjected to different standards as a Black man or pushed out because he was perceived as too threatening, as he suggests a jury should infer from Noble's comments about his voice being too deep. We know that implicit bias can infect the workplace. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 372–73 (2011) (Ginsburg, J., concurring in part and

dissenting in part) ("Managers, like all humankind, may be prey to biases of which they are unaware."). And we recognize that procuring evidence can be tricky in retaliation and discrimination cases. But our case law makes it Johnson's responsibility to provide the court with sufficient evidence to survive summary judgment, and that was not done here. *See* N.D. Ill. L.R. 56.1(b); *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) ("As we have said many times, summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." (cleaned)).

### B. Title VII Claim

Since Johnson's § 1981 claim fails on the merits, his Title VII claim must also fail. *See Baines*, 863 F.3d at 661 (explaining the same standards govern § 1981 and Title VII claims). Accordingly, we do not address if Johnson's Title VII claim would be timely and if tolling applies, two questions the parties debated on appeal.

### III

Johnson tried to persevere in a workplace that he had reason to believe was biased against him. As he tells it, his complaint of discrimination caused his difficulty being staffed on projects and eventual termination. But Johnson failed to create a record to link his complaint to any of the five adverse employment actions he identified. We are limited to the summary judgment record before us, and it does not permit us to conclude that a reasonable jury could find for Johnson on his retaliation claims.

AFFIRMED.